In the Matter of the Supervised Estate of David A. BENDER, Deceased

Paul E. Bender, Appellant,

v.

Brian D. Bender and Monroe Bank, as Trustee, Appellees.

No. 53A01–0411–CV–473.

Court of Appeals of Indiana.

March 22, 2006.

Rehearing Denied June 20, 2006.

Peter J. Rusthoven, Bart A. Karwath, Mark J. Crandley, Paul L. Jefferson, Barnes & Thornburg LLP, Indianapolis, for Appellant.

Angela S. Cash, Jeffrey S. Toole, Scopelitis, Garvin, Light & Hanson, Indianapolis, for Appellees.

## OPINION

KIRSCH, Chief Judge.

Paul E. Bender ("Paul"), as personal representative in the supervised Estate of David A. Bender (the "Estate"), appeals the probate court's [1] entry of partial summary judgment in favor of David's son, Brian D. Bender ("Brian"), and Monroe Bank ("Trustee"), as Trustee of the David A. Bender Irrevocable Trust for the benefit of Brian.[2] On appeal the parties raise the following consolidated and restated issues:

I.  Whether the probate court erred in determining that conveyances of Estate property made by Paul, acting in his capacity as personal representative of David's supervised estate, were void due to self-dealing, breach of fiduciary duty, and failure to obtain prior approval.

II.  Whether the probate court erred in determining that the agreements, which governed the operation of the Bender Family business entities, did not reflect David's testamentary intent.

III.  Whether the probate court had jurisdiction to construe the terms of the Bender Family agreements and, if so, whether the probate court properly interpreted those agreements.

IV.  Whether the probate court erred in concluding that Paul could not assert the affirmative defenses of waiver, estoppel, and laches.

V.  Whether the probate court erred in charging Paul with payment of attorney fees.

We affirm in part, reverse in part, and remand for further proceedings.[3]

## FACTS AND PROCEDURAL HISTORY [4]

On September 18, 1987, David A. Bender ("David") executed his Last Will and Testament ("Will"), in which he directed the payment of Estate debts, made specific bequests of his Porsche to Paul and $50,000 to his daughter, named a personal representative to administer his Estate,

---

1.  The controversy that resulted in the grant of partial summary judgment arose within the supervised proceedings of the Estate. Although Monroe County does not have a designated probate court, Judge Taliaferro's trial court served in that capacity while settling the Estate. For ease of reference, we refer to her court as a probate court.

2.  The probate court granted partial summary judgment on issues pertaining to Paul's transfer of the interests in the Bender Family Business entities from the Estate; however, the probate court maintained jurisdiction over all other issues relating to the administration of the Estate.

3.  On June 13, 2005, Appellees filed with this court a Motion to Strike portions of Appellant's Brief. On July 22, 2005, our court ordered that a decision on that Motion was to be held in abeyance pending full consideration of the merits of this cause. The Appellees' Motion is hereby GRANTED. Because our decision on the merits of this cause does not implicate the language, there is no need for further discussion of this Motion.

4.  We heard oral argument on this case on October 4, 2005, in Indianapolis. We commend counsel on the quality of their written and oral advocacy.

and left the residuary of his Estate to his son Brian as follows:

> I give, bequeath, and devise all my residuary estate, being all property, real and personal, tangible and intangible, wherever situated, in which I may have any interest at the time of my death not otherwise effectively disposed of to my son, Brian David Bender, . . .

*Appellant's App.* at 101. Five years later, David executed a codicil to his Will ("Codicil"), which modified only one issue—naming his brother Paul as personal representative for his Estate in place of the person previously named. David died testate on June 25, 1998.

At the time of his death, David and his two brothers, Paul and John W. Bender ("John"), owned the following family businesses: Bender Lumber Company, Inc., an Indiana corporation ("Lumber"); Bender Enterprises, an Indiana general partnership ("Enterprises"); Bender Vernal LLC, an Indiana limited liability company ("Vernal"); and Indiana Leasing, an Indiana general partnership ("Leasing") (collectively, the "Bender Businesses"). Prior to David's death, the brothers entered into partnership agreements for Enterprises and Leasing, a Restrictive Stock Agreement for Lumber, and a Buy–Sell Agreement for Vernal (collectively, the "Bender Agreements"). *Id.* at 327, 340, 352, 364. David's Will and Codicil made no reference to the Bender Agreements or to the disposition of David's share of the Bender Businesses.[5]

Paul was appointed as personal representative of the Estate on July 27, 1998.

On August 5, 1998, notice of his appointment was first published. Eight months later, on April 29, 1999, Paul filed the inventory of the Estate's assets. *Id.* at 2–3.

In June and July of 1999, acting in his capacity as personal representative, Paul sold the Estate's interests in Lumber to himself for $57,200. He also sold the Estate's interest in Vernal and Enterprises to himself and to John, in equal shares, at a total price of $45,000 and $700,000, respectively. Finally, Paul transferred the Estate's interests in Leasing to himself and to John. No money was paid to the Estate in connection with this latter transaction due to a legal opinion that Leasing's assets had no value. *Id.* at 374. Believing that the Bender Agreements required these sales, Paul completed these transfers without notification to or the approval of Brian, the Trustee, or the probate court.

Paul filed his Personal Representative Intermediate Report ("Intermediate Report") with the probate court in June 2001. *Id.* at 126. Attached to the Intermediate Report was a summary of the Estate's accounts with schedules showing receipts and disbursements from June 25, 1998 through June 13, 2001. *Id.* at 129–69. This forty-page summary made reference to Paul's conveyances of the Estate's interests in the Bender Businesses to Paul and John. *Id.* at 132, 145. On June 22, 2001, the probate court entered an order approving, settling, and confirming the Intermediate Report. *Id.* at 28.[6]

Approximately two years later, on July 21, 2003, Brian and the Trustee filed a

---

5. The Will, which was executed prior to the establishment of the Bender Businesses, understandably made no mention of the entities. However, the Codicil was executed in 1992—after the brothers had entered into the Lumber Restrictive Stock Agreement and the Enterprises Partnership Agreement.

6. Paul filed a Final Inventory on August 6, 2004, which, according to the chronological case summary, the probate court has yet to approve.

Complaint to Set Aside Sale of Decedent's Business Interests, alleging that Paul had purchased the Bender Businesses substantially below their true value and that the sales transactions were "void" for Paul's "self-dealing" and for his having failed to obtain a court order authorizing the sale. *Id.* at 30–32. The complaint also alleged that David's Will or a settlement agreement did not authorize the sale.[7] *Id.* at 32. Paul responded, raising the affirmative defenses of laches, estoppel, and waiver. *Id.* at 37.

About a year later, Brian and the Trustee filed a motion for partial summary judgment. After a hearing, the probate court entered its October 12, 2004 order granting their motion. *Id.* at 18–26. The order, in part, provided that the sales and transfers of David's interests were void as a matter of law; that Paul's self-dealing constituted constructive fraud because Paul breached his fiduciary duties; that the Bender Agreements were not valid testamentary expressions of David's intent; and directed the return of $25,000 in personal representative fees that had been paid to Paul and $50,000 in attorney fees that had been paid to Paul's attorneys. *Id.* at 21–25. The order also construed the terms of the Bender Agreements, ruled that the defenses of waiver, estoppel, and laches did not apply, awarded Brian attorney fees, and ruled in favor of Brian on

other subsidiary issues. *Id.* 21–25, *Appellant's App.* at 4. Paul now appeals the probate court's grant of partial summary judgment. Additional facts will be added as needed.

## DISCUSSION AND DECISION [8]

■ The parties disagree about the appropriate standard of review this court should use to judge the probate court's grant of partial summary judgment in favor of Brian and the Trustee. Citing *Peoples Bank & Trust Co. v. Price,* 714 N.E.2d 712, 716 (Ind.Ct.App.1999), *trans. denied,* Paul asserts that construction of the Bender Agreements is a pure question of law for the courts and, therefore, that our standard of review on appeal is de novo. *Appellant's Br.* at 11. We agree with Paul that the interpretation of the Bender Agreements is integral to the ultimate distribution of the Estate. However, at this point in the probate proceedings, we need not concern ourselves with contract interpretation. Instead, we must determine whether the probate court erred in granting partial summary judgment, i.e., whether there is a genuine issue of material fact that Paul's conveyances of the Estate's interest in the Bender Businesses were void.

Our standard of review for a grant of summary judgment is the same as that

7. Pursuant to IC 29–1–9, the compromise of any controversy pertaining to any person's right or interest in the decedent's estate may be set forth in writing, executed by all competent persons with an interest in the estate, and submitted to the court for its approval.

8. During the pendency of this appeal, Paul filed a motion to voluntarily dismiss the appeal without prejudice, suggesting that the probate court's decision might not be a final appealable order due to the court's failure to make the determination that there was no just reason for delaying order. Ind. Trial Rule 56(c); *Appellant's App.* at 641. Our court

denied Paul's motion and allowed the appeal to proceed pursuant to Ind. Appellate Rule 66(B). In *Daimler Chrysler Corporation v. Yaeger,* 838 N.E.2d 449 (Ind.2005), our Supreme Court held that App. R. 66(B) "does not authorize an interlocutory appeal that fails to comply with Appellate Rule 14." *Yaeger,* 838 N.E.2d at 449–50. Here, unlike, *Yaeger,* Paul's appeal is appealable as of right pursuant to App. R. 14(A) because he appealed an order pertaining to the payment of money and delivery of securities. *Yaeger,* therefore, does not control our jurisdiction over this case.

used in the trial court: summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Chenoweth v. Estate of Wilson*, 827 N.E.2d 44, 47 (Ind.Ct.App.2005). The moving party bears the burden of designating sufficient evidence to eliminate any genuine factual issues and, once the moving party has fulfilled this requirement, the burden shifts to the nonmoving party to come forth with contrary evidence. *Id.* All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Id.* at 48.

On appeal, we consider only those matters that were designated to the trial court at the summary judgment stage. *Reed v. Beachy Constr. Corp.*, 781 N.E.2d 1145, 1148 (Ind.Ct.App.2002), *trans. denied.* We do not weigh the evidence, but we liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact for trial. *Id.* The party that lost in the trial court has the burden to persuade the appellate court that the trial court erred. *Id.* Specific findings and conclusions by the trial court are not required, and although they offer valuable insight into the rationale for the judgment and facilitate our review, this court is not limited to reviewing the trial court's reasons for granting summary judgment as it may be affirmed upon any theory supported by the designated materials. *Id.*

## I. Conveyance of the Bender Businesses

The probate court granted summary judgment to Brian and to the Trustee, reasoning that Paul's 1999 conveyances of the Estate's interest in Bender Businesses were void as a matter of law due to Paul's self-dealing, his breach of fiduciary duty,

and his failure to obtain the prior approval required in a supervised estate. Paul, while acknowledging that he did not obtain prior court approval, asserts that the Bender Agreements directed him, as personal representative, to sell David's interests in Lumber, Vernal, and Enterprises to the purchasers designated in the Bender Agreements, i.e., to John and to himself. As such, Paul contends that his actions in selling David's interests could not have been self-dealing. Paul further contends that to prevent him, as personal representative, from making transfers that would allow the Bender Companies to remain closely held would frustrate David's intent. Specifically, Paul asserts that, because the Bender Agreements directed that interests in the Bender Businesses be disposed of in a certain manner, he was not self-dealing or acting improperly when he transferred these interests to John and to himself.

Article VI of David's Will conferred upon his personal representative "all powers enumerated and granted to a Personal Representative under the Indiana Code, and any other power that may be granted by law, to be exercised without the necessity of Court approval." *Appellant's App.* at 105. His Will also provided that the personal representative should serve without posting a bond. In his Codicil, David replaced Article VI in its entirety with the following new paragraph: "I hereby appoint Paul E. Bender as Personal Representative of my Last Will and Testament." *Id.* at 108. The Codicil did not grant Paul the authority to administer the Estate without court supervision, nor did it allow him to sell property to himself.

While Indiana law allows legatees and devisees, under certain conditions, to petition the court for unsupervised administration of an estate, *see* IC 29–1–7.5–1, –2, no such petition was made here. *See* 13 I.L.E., *Executors and Administrators*

§ 12, at 340 (2001). Consequently, Paul was acting as personal representative for David's *supervised* estate.

> The Probate Code contains detailed provisions governing the various aspects of the supervised administration of an estate, including the collection and management of assets; the sale ... of personal and real property; and the distribution of the estate and discharge of the personal representative. A personal representative of an estate subject to supervised administration may have to obtain a court order for a variety of actions, such as for the sale ... of personal property or real property, or for the payment of fees to the personal representative or an attorney for the estate.

*Id.* at 339.

Under the Indiana Probate Code, a personal representative is responsible for collecting and preserving all assets of the decedent's estate. IC 29–1–13–1. Thereafter, a personal representative of a supervised estate may only sell estate property if: (1) the authority to sell is expressly granted in the decedent's will; (2) the authority is granted by statute; or (3) the personal representative first obtains the court's prior approval for the sale. 13 I.L.E. § 152, at 512–13; *see* IC 29–1–15–2, –3, –8. Paul failed to comply with any of these conditions. First, Paul did not obtain prior court approval for the sale of David's interests in the Bender Businesses. Second, David's Will, as amended by the Codicil, did not grant Paul authority to sell any of David's business interests. In fact, the Codicil, which was executed after some of the Bender Businesses had been formed, specifically removed powers granted by the Will to the previous personal representative. Third, there was no statutory authority for the personal representative to sell the Bender Businesses without court approval.

Of greater significance, a personal representative of an estate is regarded as a trustee appointed by law for the benefit of and the protection of creditors and distributees of that estate. *Williamson v. Williamson*, 714 N.E.2d 1270, 1273 (Ind. Ct.App.1999); *Fall v. Miller*, 462 N.E.2d 1059, 1061 (Ind.Ct.App.1984). "There is a thread which runs through the law governing fiduciary relationships which forbids a person standing in a fiduciary capacity to another from profiting by dealing in the property of his beneficiary, and any such profit realized must be disgorged in favor of that beneficiary." *Fall*, 462 N.E.2d at 1061. This fiduciary relationship also precludes a personal representative of an estate from acting as Paul did here, i.e. purchasing "property himself as an individual from himself as the personal representative." *Williamson*, 714 N.E.2d at 1273 (citing *Matter of Estate of Garwood*, 272 Ind. 519, 400 N.E.2d 758, 764 (1980) (setting aside a conveyance of real estate where the personal representative acted as seller and deeded property to himself as an individual purchaser)).

In *Williamson*, a dispute arose between two brothers over their father's estate. Donald acted as the personal representative for the estate, which provided that Donald and Robert would share their father's estate equally. The estate was unsupervised. The estate included a twelve-acre piece of property. During the administration of the estate, Donald obtained two separate estimates for the value of the property, assigned a value that roughly averaged the two values, and purchased the property for $141,250. Thereafter, Donald filed a final accounting for the property, which revealed Donald's purchase of the property. Robert filed a written objection to the closing statement contending that Donald had unilaterally conveyed the real estate without his con-

sent. The trial court entered its judgment approving the closing statement and final accounting.

Robert appealed, claiming that Donald's conveyance of the property constituted inappropriate self-dealing and a breach of fiduciary duty. Robert further argued that by approving the distribution, the trial court had abused its discretion. Our court agreed. Noting that a personal representative is regarded as a trustee appointed by law for the benefit of and the protection of creditors and distributees, our court concluded that, in Indiana, purchases of estate assets by personal representatives at their own sales, if made in the absence of a family settlement or agreement, are void. *Williamson*, 714 N.E.2d at 1273; *see Fall*, 462 N.E.2d at 1061. Our court reasoned:

> "[I]t has been the settled law of Indiana since its beginning, that a probate personal representative of the deceased is a trustee of the estate assets and will not be permitted to purchase the property himself as the personal representative." *Matter of Estate of Garwood*, 272 Ind. 519, 400 N.E.2d 758, 764 (1980) (setting aside a conveyance of real estate where personal representative acted as seller and deeded property to himself as an individual purchaser); *but c.f. Matter of Estate of Hensley*, 413 N.E.2d 315, 317 (Ind.Ct.App.1980) (affirming a conveyance of real estate by the personal representative to himself where decedent's Will anticipated such authority). The policy behind the prohibition on the transfer of estate property is to eliminate any hint of impropriety or fraud.

*Williamson*, 714 N.E.2d at 1273–74.

Quoting our Supreme Court's reasoning in *Garwood*, the *Williamson* court explained:

> "[I]t matters not that there was no fraud contemplated and no injury done. The rule is not intended to be remedial of actual wrong, but preventive of the possibility of it.... It matters not how innocent and bona fide and free from suggestion of fault the transaction may be, nor how harmless or even beneficial the interference of the trustee may have been, the trustee can never, by his own act, shake off the equity of the cestui que trust [9] to have the benefit of all that he does in the scope of the trust...."

*Id.* at 1273 (quoting *Garwood*, 400 N.E.2d at 764).

In *Williamson*, the trial court concluded that Donald's conveyance was the only rational way to distribute the property. While this court did not believe that Donald had engaged in some form of impropriety by conveying the property to himself, the court nonetheless concluded that the trial court's judgment in approving the closing statement was clearly erroneous. *Id.* at 1274. The court reasoned:

> The trial court did not find, nor does the evidence show, that Claude Williamson's probated Will anticipated the authority of the personal representative to convey estate property to himself as an individual purchaser. In like fashion, the trial court did not find, nor does the evidence show, there was a settlement or an agreement between the two brothers permitting Donald, as personal representative of the estate, to purchase the Charlestown Road property. Absent either of the foregoing contingencies, Donald's purchase of the property is void and the deed conveying the property to Donald must be set aside. *See*

9. Black's Law Dictionary defines cestui que trust as, "He who has a right to a beneficial interest in and out of an estate the legal title to which is vested in another." Here, Brian is the cestui que trust.

*Garwood,* 272 Ind. at 528–29, 400 N.E.2d at 764; *Hensley,* 413 N.E.2d at 318. We therefore reverse the judgment of the trial court on this issue and remand this cause for further proceedings.

*Williamson,* 714 N.E.2d at 1274. Here, regardless of the reasons, Paul sold property from himself as personal representative of the estate to himself as an individual. The court was correct in finding that Paul engaged in self-dealing.[10]

The probate court was also correct in finding that Paul had breached his fiduciary duty. As personal representative for David's Estate, Paul was administering the Will in accordance with Local Probate Rules of Monroe Circuit Court ("Probate Rules"). Pursuant to Probate Rule 4A, an inventory shall be filed by the fiduciary in all supervised estates within sixty days of the appointment of the fiduciary. Paul was appointed personal representative on July 27, 1998. A September 17, 1998 entry in the chronological case summary noted that an inventory had not been filed. Even so, Paul did not file his inventory until April 1999—seven months after the probate court's notation and nine months after Paul was appointed personal representative.

Probate Rule 6A provides:

In all supervised estates . . . no petition for sale of personal property shall be granted unless a written appraisal, prepared by a person competent to appraise such property and setting forth the fair market value of the property to be sold is filed with the court either at the time of filing of the petition to sell or at the time the inventory is filed.

Prior to selling the interests in Bender Businesses to himself and to John, Paul obtained an appraisal of those businesses, as of April 8, 1999, from Harold A. Harrell. However, because Paul did not file a petition for sale, nothing triggered the beneficiaries or the court to inquire into the validity of that appraisal. It was a breach of fiduciary duty for Paul to sell the Bender Businesses to himself without the consent of the beneficiaries or court approval.

Under Probate Rule 7, within five months and fifteen days after the date of the first published notice to creditors, the fiduciary or his attorney must examine the Claims Docket and shall allow or disallow each claim filed against the estate. Here, it was not until June 16, 2001, almost three years after the first published notice and two months after the probate court ordered the personal representative to "file necessary documents to close this estate or appear in open court," *Appellant's App.* at 3, that Paul filed any document disclosing what claims had been paid by the Estate. This lapse prevented Brian, the Trustee, and the probate court from understanding

---

10. This prohibition against a personal representative dealing for his own benefit is also found in IC 29–1–14–17, which addresses the issue of a personal representative collecting a claim he has against the estate he represents, which accrued before the decedent's death. IC 29–1–14–17, in pertinent part, provides:

> Whenever a claim in favor of a personal representative . . . is filed against an estate . . . the claim shall not be acted upon by the personal representative unless all interested persons who would be affected by the allowance of the claim consent in writing to it. If all interested persons do not consent to the payment of that claim, the judge shall appoint a special personal representative who shall examine the nature of the claim [and pay it if just].

Thus, if the special personal representative believes it is in the best interest of the estate to oppose the personal representative's claim, the special personal representative may employ counsel to represent himself, disallow the claim, or ask the court to set the claim for trial. IC 29–1–14–17. No lesser standard should apply to a personal representative who claims that he has an interest in estate property pursuant to the terms of an agreement.

in a timely fashion what actions Paul had taken on behalf of the Estate.

Probate Rule 8 requires:

Whenever an estate cannot be closed within one year, an intermediate account shall be filed with the Court within thirty days after the expiration of one year and each succeeding year thereafter. Such accounting shall comply with the provisions of Indiana Code Sections 29-1-16-4 and 29-1-16-6, and

1. Shall state facts showing to the Court the reasons the estate cannot be closed and providing the Court with an estimated date of closing.

2. Shall propose partial distribution of the estate to the extent that partial distribution can be made without prejudice to distributees, claimants, and taxing authorities.

The Estate was opened in late July of 1998. To comply with the Probate Rules, Paul should have filed an intermediate report in August of both 1999 and 2000. Paul filed his first intermediate report on June 19, 2001, almost two years late. Probate rules favor the expeditious administration of estates. *Inlow v. Henderson, Daily, Withrow & DeVoe,* 787 N.E.2d 385, 395 (Ind.Ct.App.2003), *trans. denied.* Yet, almost three years after David's death, Paul filed his first intermediate report with the court.

As personal representative, Paul: (1) failed to obtain prior approval of the conveyance of the Bender Businesses out of David's Estate; (2) sold the Bender Businesses to himself and to John without Brian's agreement; and (3) failed to follow probate laws and rules in the administration of the Estate. Brian and the Trustee's partial summary judgment presented no genuine issues of material fact concerning the appropriateness of Paul's conveyances. The probate court did not err in finding that Paul's conveyances of the Bender Businesses were void, and in granting partial summary judgment to Brian and the Trustee on that issue.

■  After finding the transactions void, the probate court here ordered the return of the property along with its profit in the form of a constructive trust. *Appellant's App.* at 24-25. The probate court also directed that Paul, John, and the Bender Businesses disclose and turn over all necessary information and documentation to the Estate and Brian to allow the parties to calculate the "profits associated with David's interests in the Bender Companies that have accrued since the date of death through the date that such interests are returned to the Estate." *Id.* at 55. We find the probate court's actions were proper.

■  The Indiana Probate Code holds a personal representative personally liable for all estate property the personal representative comes to possess and, specifically, for any loss to the estate through self-dealing. IC 29-1-16-1. The personal representative may not profit from an increase in the estate. *Id.* A constructive trust for the benefit of the estate is the preferred method for restoring estate property that has been removed wrongfully from the estate by the personal representative. *Fall,* 462 N.E.2d at 1063. A constructive trust may be imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. *Morfin v. Estate of Martinez,* 831 N.E.2d 791, 801 (Ind.Ct.App.2005); *Strong v. Jackson,* 777 N.E.2d 1141, 1151 (Ind.Ct.App.2002), *aff'd on rehearing,* 781 N.E.2d 770 (Ind.Ct.App.2003), *trans. denied.* "A duty to convey the property may arise if it was acquired through fraud, duress, undue

influence or mistake, or through a breach of a fiduciary duty, or through the wrongful disposition of another's property." *Morfin*, 831 N.E.2d at 801–02.

The type of fraud necessary for the establishment of a constructive trust may be either actual or constructive. *Id.* at 802. Constructive fraud arises by operation of law from a course of conduct, which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud. *Drudge v. Brandt*, 698 N.E.2d 1245, 1250 (Ind.Ct. App.1998). "A plaintiff alleging the existence of constructive fraud has the burden of proving the existence of a duty owing by the party to be charged to the complaining party due to their relationship, and the gaining of an advantage by the party to be charged with fraud." *Morfin*, 831 N.E.2d at 802. Here, it is undisputed that Paul was in a fiduciary relationship with Brian.

If the plaintiff meets the burden of proof with respect to establishing the existence of a fiduciary relationship, there is a presumption of fraud in the challenged transaction. *Id.* The burden then shifts to the defendant to prove at least one of the following by clear and unequivocal proof: (1) that he or she made no deceptive material misrepresentations of past or existing facts or did not remain silent when a duty to speak existed; (2) that the complaining party did not rely on any such misrepresentation or silence; or (3) no injury proximately resulted from the misrepresentation or silence. *Id.* Here, Paul remained quiet when he had a duty to speak, i.e.,

when he had the duty to file inventories, request prior approval from the court, and otherwise notify Brian and the Trustee of his intentions with respect to the Bender Businesses.[11] The probate court's imposition of a constructive trust was entirely appropriate.

## II. The Bender Agreements and Testamentary Intent

Paul next contends that the probate court erred because it determined that the Bender Agreements were "not valid." *Appellant's Br.* at 21. However, Paul's argument misconstrues the language used by the probate court. In its order, the probate court provided as follows:

> The Lumber Stock Agreement, the Lumber Stock Agreement Amendment, the Vernal Buy–Sell Agreement, and the Enterprises Value Agreement are not valid testamentary expressions of David's intent. *Reed v. Reed*, [105 Ind. App. 185] 14 N.E.2d 320 (Ind.Ct.App. 1938). The Will executed by David expresses his intent.

Thus, contrary to Paul's contention, the probate court did not determine that the Bender Agreements were invalid; rather, it determined that the terms of the Bender Agreements were not valid expressions of David's testamentary intent.[12] His Will and Codicil expressed that intent. The trial court did not err in reaching this conclusion.

The probate court's ruling did not invalidate the Bender Agreements and,

---

11. While finding that the trial court correctly imposed a constructive trust on the Bender Business interest transferred out of the Estate, this opinion makes no determination as to the appropriate amount to be retained in the constructive trust.

12. The proper construction of the Bender Agreements was not an issue before the trial

court, is not an issue before this court, and is not resolved by this opinion. *See Matter of Williams' Estate*, 398 N.E.2d 1368, 1370 n. 2 (Ind.Ct.App.1980) (determination of whether probate statutes required or prevented enforcement of the Family Agreement did not require court to interpret terms of the Family Agreement).

contrary to Paul's contention, will have no impact on closely-held companies or their business planning practices. *See Appellant's Br.* at 21–22. The expectations of Indiana practitioners and their small business clients will remain the same. The only thing that will, and should, change is the manner in which a personal representative settles an estate. "Unlike a number of states, Indiana has no corporate law specifically applicable to close corporations." *G & N Aircraft, Inc. v. Boehm,* 743 N.E.2d 227, 243 (Ind.2001). Therefore, a fiduciary that oversees transactions affecting closely-held stocks should act with the same care as any other fiduciary. Here, Paul was not precluded from fulfilling David's wishes. Paul could have successfully conveyed the shares of the Bender Businesses if he had entered into an agreement with all interested parties to sell the shares, or if he had notified the probate court prior to the transactions and obtained the court's approval.

### III.  The Bender Agreements

Paul contends that if his sales of the Bender Businesses were void, the probate court no longer had subject matter jurisdiction to adjudicate any claim based on the Bender Agreements because no claim was filed pursuant to IC 29–1–14–21. "Subject matter jurisdiction refers to the power of courts to hear and decide a class of cases." *Allen v. Proksch,* 832 N.E.2d 1080, 1095 (Ind.Ct.App.2005). To determine whether a court has subject matter jurisdiction, we must ask whether the claim falls within the general scope of authority conferred on the court by the Indiana Constitution or by statute. *Mariga v. Flint,* 822 N.E.2d 620, 629 (Ind.Ct.

App.2005), *trans. denied.* Whether a lower court had jurisdiction is a pure question of law, and we review the issue de novo. *Id.* The Monroe Circuit Court is a court of general jurisdiction that must maintain a probate docket. IC 33–33–53–2. As a court of general jurisdiction, the probate court had the power and authority to oversee any aspect of David's Estate, including the interpretation of the Bender Agreements. *See In re Estate of Carter,* 760 N.E.2d 1171, 1175 (Ind.Ct.App.2002), *trans. denied* (probate court could construe will, which had been probated in another county, if necessary to resolve issue in estate before the court).

Notwithstanding our finding that the probate court had subject matter jurisdiction to interpret the Bender Agreements, we agree with Paul that the probate court erred in interpreting the Bender Agreements at this stage of the proceedings. The probate court's grant of partial summary judgment was premised on the finding that Paul's conveyances of the Bender Businesses from the Estate were void because Paul had not been granted the power by the Will, by statute, or by the court to make the conveyances he made to himself and to John. After finding that these conveyances were void, it was improper at this point in the probate administration for the court to interpret the terms of the Bender Agreements.[13] We therefore reverse the probate court's findings pertaining to specific interpretations of the terms of the Bender Agreements.

### IV.  The Defenses of Waiver, Estoppel, and Laches

Paul asserts that the probate court erred in concluding that waiver, estoppel,

---

**13.** Paul also questioned whether a grant of summary judgment should have been precluded because genuine issues of material fact existed regarding (1) the valuation of Leasing's assets, and (2) the profit Paul realized

from a subsequent sale of his interest in Lumber. Finding that it was inappropriate for the trial court to interpret specific terms of the Bender Agreements, we need not address these issues.

and laches do not apply to bar Brian and the Trustee's claims that the transfers are void. We disagree.

As to the waiver issue, the probate court correctly noted that Brian could not have consented to or waived his rights to object to Paul's sale. Here, Paul failed to give notice to Brian or to the court of his intent to transfer and sell the Estate's interests in the Bender Businesses; as such there was no opportunity for Brian to waive his rights.

The probate court also concluded that laches did not apply. Laches is an equitable doctrine that is comprised of three elements: inexcusable delay in asserting a right, an implied waiver arising from knowing acquiescence in existing conditions, and a change in circumstances causing prejudice to the adverse party. *Shriner v. Sheehan*, 773 N.E.2d 833, 846 (Ind.Ct.App.2002), *trans. denied*. A trial court has considerable latitude in deciding whether to invoke laches, and its decision will not be reversed on appeal absent an abuse of that discretion. *Id.*

Pursuant to IC 29–1–16–6(c), every "intermediate account approved without notice shall be subject to review by the court at any time and shall not become final until the personal representative's account in final settlement is approved by the court." *Appellant's Br.* at 53. Here, Paul filed an Intermediate Report on June 19, 2001 and did not request the distribution of assets of the Estate, nor did he ask that the report be made final as to matters reported in the account. *Id.* at 53. Because Paul's Intermediate Report was not a final accounting, Brian had the right to challenge and object to Paul's Intermediate Report and conveyances, and the probate court could review Paul's Estate transactions at any time until the final accounting. Even then, the court could vacate or modify its orders within one year of the discharge of the personal representative upon final settlement. IC 29–1–1–21. Brian filed his complaint to set aside the sale of the Bender Business interests on July 21, 2003. Paul's Final Report was not filed until August 6, 2004—more than one year later. The probate court did not abuse its discretion in finding that laches was inapplicable.

The doctrine of estoppel springs from equitable principles, and it is designed to aid in the administration of justice where, without its aid, injustice might result. *Levin v. Levin*, 645 N.E.2d 601, 604 (Ind.1994) (citations omitted). "Our use of this doctrine is not limited to circumstances involving an actual or false representation or concealment of an existing material fact. Rather, equitable estoppel is [a] remedy available if one party through his course of conduct knowingly misleads or induces another party to believe and act upon his conduct in good faith without knowledge of the facts." *Id.* (citations omitted). Paul contends that, because Brian knew of the conveyances and failed to act, Brian is estopped from claiming that Paul breached his fiduciary duty. The defense of estoppel is inapplicable in this case because Brian did not induce Paul or cause him to act. We agree with the probate court that estoppel was not a defense available to Paul.

### V. Attorney Fees

Paul finally contends that the probate court erred in holding him personally liable for the attorney fees Brian expended in pursuing his complaint. The probate court stated:

39. When a trustee commits a breach of trust, the trustee is liable to the beneficiary for reasonable attorney fees incurred by the beneficiary in bringing an action on the breach.

Indiana Code 30–4–3–11(b). This code applies to the fiduciary obligations of a personal representative to an estate, its creditors, and beneficiaries. *Fall,* 462 N.E.2d at 1062.

40. Paul is liable for all attorney fees that Brian has incurred in bringing his claims to set aside the sales and for Paul's breach of his fiduciary duty to the Estate. Brian's reasonable attorney fees shall be determined at future hearings.

*Appellant's Br.* at 55. Paul asserts that, notwithstanding the provision in Indiana's Trust Code, our Probate Code does not authorize the recovery of attorney fees in a case such as this.

Here, the probate court imposed a constructive trust to pull the property that was improperly transferred from the Estate back into the Estate. A constructive trust is an equitable remedy. To fully compensate Brian for the loss caused by Paul's breach of fiduciary duty in administering the Estate, equity demands that Paul should pay for the attorney fees incurred to prevent Paul from acting outside his fiduciary powers. Otherwise, the only deterrent to Paul acting outside the bounds of his powers is the chance that any improper transfer, and the profits derived therefrom, will be placed in a constructive trust.

█ The probate court did not err in citing to the Trust Code to support an award of attorney fees. A personal representative, like a trustee, is a fiduciary who acts on behalf of the beneficiary. It was proper for the probate court to conclude that attorney fees available for a fiduciary's wrongdoing in a trust are equally available for a fiduciary's wrongdoing in an estate, and that these fees should be paid by the fiduciary personally. The trial court did not err in granting attorney fees to be paid by Paul to Brian.

## VI. Issues not Appealed

We note that the probate court entered additional findings that Paul is not appealing. The probate court directed Paul to return $75,000 to the Estate, which represented $50,000 paid for attorney fees to administer the Estate and $25,000 paid to him as personal representative. The probate court offered that after petitions for fees are filed with the court, it would consider what fees, if any, are appropriate for Paul as personal representative and for Paul's attorneys. The probate court also directed Paul, John, and the Bender Businesses to turn over all necessary information and documentation to the Estate and to Brian to allow the parties to calculate date of death values for David's interests in the Bender Businesses and to calculate all profits associated with David's interests in the Bender Businesses that have accrued since the date of death until the date that such interests are returned to the Estate.

We affirm the probate court's grant of partial summary judgment on the basis that Paul's transactions of the Bender Businesses were void. We also find that the probate court did not abuse its discretion in making Paul personally liable for attorney fees incurred by Brian in pursuing his complaint against Paul. Finally, we reverse the probate court's construction of the terms of the Bender Agreements finding that such interpretation was premature.

Affirmed in part, reversed in part, and remanded for additional proceedings.

MAY, J., and VAIDIK, J., concur.