In the Matter of the SUPERVISED ESTATE OF Edith Alice SCHOLZ, Deceased,

Kenneth Scholz, Personal Representative, Appellant–Plaintiff,

v.

Lorraine Kirk, Appellee–Defendant.

No. 37A03–0601–CV–1.

Court of Appeals of Indiana.

Jan. 9, 2007.

Robert H. Little, Rebecca A. Trent, Brookston, IN, Attorneys for Appellant.

John T. Casey, Edward P. Dumas, Dumas, Weist & Mahnesmith, Rensselaer, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### *STATEMENT OF THE CASE*

Ken Scholz ("Ken") appeals the trial court's order that granted the objection of Lorraine Kirk ("Lorraine") to the final accounting he filed as personal representative of the estate of Edith Alice Scholz ("Mrs. Scholz") and ordered him to pay annual cash rent of $12,000 to farm the estate's real property.

We affirm.

### *ISSUE*

1. Whether the trial court erroneously construed the scope of the life estate created by the will of the beneficiaries' mother, Mrs. Scholz, and bequeathed to Ken.

2. Whether the trial court's order must be reversed because it erroneously held

that as personal representative, Ken had a fiduciary duty to maximize estate income.

3. Whether the trial court's order must be reversed because Lorraine had not objected to the personal representative's rental arrangement in a timely fashion.

4. Whether the trial court's order must be reversed because two of the three beneficiaries of the estate—Ken and Shirley Ann Duley ("Shirley")—consented to the amount of rent paid by Ken as the life estate holder to Ken as the personal representative of the estate.

### FACTS

Mrs. Scholz owned agricultural acreage that Ken began farming as a tenant farmer in 1973. Mrs. Scholz had four children: Ken, Devone, Shirley, and Lorraine. On November 14, 1983, Mrs. Scholz executed a will that bequeathed all property that she owned at the time of her death to her children "in equal shares," specifying that "each of [her] children take one-fourth (1/4) of [her] estate as joint tenants in common." (App.5). The will further provided that if one of her children predeceased her without issue, "then said property will revert back to [her] estate." *Id.* Mrs. Scholz's will also appointed Ken to act as executor of the estate. Between 1983 and July 21, 2001, Devone died. On July 21, 2001, Mrs. Scholz died.

On October 31, 2001, Ken was appointed personal representative for the unsupervised administration of the estate. On August 13, 2003, Lorraine filed a verified petition seeking supervised administration of the estate; the trial court ordered Ken to proceed pursuant to "the Indiana Code governing supervised estates"; and Lorraine also petitioned for the trial court to construe Mrs. Scholz's will. (App.2).

On October 20, 2003, after "evidence submitted" at a hearing at which Ken, Shirley, and Lorraine were present, and "[b]ased upon the stipulation of all interested parties," the trial court found that Mrs. Scholz's will devised the real estate she owned to Ken, Shirley, and Lorraine "as equal tenants in common." (App.17). The trial court further ordered Ken, as personal representative, to "file his Final Accounting and Petition to Close Estate within forty-five (45) days" of the October 20, 2003 order. (App.18).

On December 12, 2003, Ken, as "Personal Representative and beneficiary of the estate," petitioned the trial court to construe the scope of the life estate created by Mrs. Scholz's will. (App.19). Ken noted that the "devise and bequest" of her estate "in three equal shares" to her surviving three children was "expressly made 'subject to a life estate that [she] hereby grant[ed] to [her] beloved son, Ken . . . , so that he may farm [her] farm land during his life,'" but that the will subsequently specified that " 'the joint tenants shall share annually in the equitable proceeds of the life estate.'" *Id.* (quoting the will). Ken, as personal representative and beneficiary, asked the trial court to construe the will's terms to confirm "that the decedent granted to him a life estate in the farm land, and to interpret and instruct the beneficiaries of this estate as to the meaning of the clause 'share annually in the equitable proceeds of the life estate.'" (App. 20, quoting the will). The trial court held a hearing on the petition on January 30, 2004.

On March 30, 2004, the trial court found that the provisions of the will, read together, gave to Ken "the right to a life estate in [Mrs. Scholz's] farm and the right to farm it for the remainder of his life, but also provid[ed] that her other children would share in the farm proceeds annually." (App.24). Thus, "the life estate granted" gave to Ken "control of the oper-

ation of the farm." *Id.* Further, the trial court held that

> so long as [Ken] is farming said farm, he will receive the landlord *and tenant's* share of the annual proceeds of the farm for an undivided one-third, *and the tenant's* share for the undivided two-thirds of said farm, with Shirley . . . and Lorraine . . . each receiving an undivided one-third of the landlord's share of the annual proceeds of said farm.

(App.24) (emphasis added).

On July 7, 2005, Ken filed his personal representative's final accounting. On August 1, 2005, Lorraine filed her objections to the final accounting. Lorraine asserted that the final accounting reported "cash rent received by [Ken] as personal representative, and paid by [Ken], as tenant" to be only $4,000 annually, which sum was "far below market value and constitute[d] self-dealing" by Ken. (App.41).

The trial court heard evidence on September 12, 2005. Wallace Bucher, a local real estate broker and appraiser who also managed substantial tenant farm acreage, estimated the "reasonable fair per acre value for cash rent" of the tillable acreage owned by Mrs. Scholz at the time of her death. (Tr. 12). According to Bucher, the tillable 37.7 acres of Jasper County property would rent for $90 to $100 per acre, and the tillable 80 acres of Pulaski County property would rent for $105 to $115 per acre. Ken testified that he and Mrs. Scholz had had a verbal agreement since 1979 whereby Ken paid her $4,000 annually "by the end of the year." (Tr. 41). Ken believed that this oral agreement had "automatically renewed" each year since then. *Id.*

On October 31, 2005, the trial court issued its order. Therein, the trial court found that the agreement between Ken and Mrs. Scholz "continued through the year 2001." (App.58). However, the trial court found, after Mrs. Scholz's death, "circumstances . . . changed," and as personal representative of the estate, Ken "had a fiduciary duty to maximize the income or earnings from the farmland." *Id.* The trial court further found that "in renting the property to himself, he was self-dealing which is a violation of his fiduciary duty as a Personal Representative of this estate." *Id.* Accordingly, the trial court held that Ken "owe[d] to the estate the fair market rental value for said farmland for the years 2002, 2003, 2004 and 2005." *Id.* at 58–59. Citing Bucher's testimony, the trial court found "that the fair market rental value for the estate's Jasper County farmland" was $95 per acre, or $3,581.50 per year; and that "the fair market rental value of the estate's tillable acreage in Pulaski County" was $110 per acre, or $8,000 per year. (App.59). Thus, the trial court found "the total fair market rental value for the decedent's farmland" to be $12,381.50 per year. *Id.* The trial court concluded that Lorraine's objection to the final accounting "should be sustained" because "the Personal Representative violated his fiduciary duty by self-dealing and renting the estate's farmland to himself for much less than its fair market rental value." (App.60). The trial court ordered Ken to pay the estate "the difference between the amount paid and the fair market rental value of the estate's property" for the years 2002, 2003, and 2004. (App.61).

Ken filed a motion to correct error, arguing that the trial court had "retroactively impose[d] supervised estate obligations on the personal representative with respect to actions and decisions performed by him while the estate was unsupervised"; "disregard[ed] the fact that a majority (2 out of 3) of the beneficiaries approved of the accounting and of the activities of the personal representative"; and "impermissibly changed the annual rent under a

verbal lease agreement for the current year, and for three prior years, despite no timely complaint or objection being filed in those prior years." (App.62). The trial court denied Ken's motion, finding "that under Indiana law, there is no difference between a fiduciary's obligation under supervised and unsupervised estate proceedings except for reporting to the Court, and that there is a prohibition against self-dealing under either form of estate proceedings." (App.66). The trial court further found "that if Ken ..., as Personal Representative of the estate, wished to continue to farm the land belonging to the estate, he should have obtained the agreement of his two sisters as to the rent he was to pay to the estate, or a special administrator should have been appointed to determine the appropriate cash rent that Ken ... should have paid." *Id.* Finally, the trial court found

> that the Court did not change the cash rent, in that there was a verbal agreement between Ken ... and the decedent, and therefore the lease was on a year-to-year basis and that the lease expired at the end of 2001. Ken ... created a new lease with himself, starting in the year 2002, to the detriment of the estate.

*Id.*

## DECISION

### 1. *Ken's Life Estate*

■ Ken first argues that the trial court "improperly disregarded the life estate" that Mrs. Scholz bequeathed to him "or disregarded the rights and benefits" accompanying that life estate. Ken's Br. at 9. He cites definitions of "life estate," and authority for the proposition that "a person having a life estate in property is entitled to the income from it." *Id.* at 11 (citing *Weaver v. Meyer*, 32 Ind.App. 587, 70 N.E. 409 (1904)). He then asserts that

the trial court's order "disregards the decedent's intent to allow her son to farm the land, and instead rules that a life estate means that the life tenant can control the operation of the farm land but cannot receive any of the income from the farm land." Ken's Br. at 14. We cannot agree.

■ A life estate may be "created by act, contract, or convention of the parties." 18 I.L.E. *Life Estates* § 2 (2003). The scope of a specific life estate is determined by examining the language used to create the life estate. *See Long v. Horton*, 126 Ind.App. 651, 133 N.E.2d 568, 571 (1956). When construing the language of a will, our primary objective is to determine the intent of the testator. *Kelly v. Estate of Johnson*, 788 N.E.2d 933, 935 (Ind.Ct.App. 2003), *trans. denied.* To determine the intent, we look at the language used within the four corners of the instrument. *Id.*

Here, the language Mrs. Scholz used in her will provided that Ken should have a life estate *to farm the land.* Thus, his life estate was restricted in that regard. As Lorraine observes, Ken was not free to solely decide as the life tenant to develop the property for commercial use. Moreover, in addition to the testamentary language creating the life estate for Ken to farm her land, Mrs. Scholz also directed that Ken and his surviving siblings equally "share annually in the equitable proceeds of the life estate." (App.5). Thus, after creating a life estate in Ken to farm the land, and in order to further her intent that the siblings receive "equal shares" of her estate, Mrs. Scholz provided that the "equitable proceeds" from the farming be shared. If, as Ken appears to contend, the will did not impose any obligation on him as the life estate holder that simultaneously provided a benefit to his siblings, then the latter testamentary restriction (that the siblings "share annually in the equitable proceeds of the life estate") would be

eviscerated. Therefore, the language used by Mrs. Scholz to create the life estate also expressed her additional intent as found and applied by the trial court. Further, pursuant to the trial court's order, Ken is not deprived of "any income from the farm land." Ken's Br. at 14. Rather, as the life-estate holder, Ken receives the proceeds of his tenant farming *and,* as beneficiary, he receives one-third the annual rental income (*i.e.,* one-third of the landlord share.) Ken's first argument fails.

## 2. *Fiduciary Duty*

■ Ken also argues that the trial court's order must be reversed because it erroneously held that a personal representative has a fiduciary duty to maximize estate income. In support of his argument, he cites the statutory duties of the personal representative and notes the absence therein of such a duty.

■ Ken's argument fails to recognize the express statutory prohibition, *see* Ind. Code § 29–1–16–1, of self-dealing by a personal representative—dealing by the personal representative "for his own benefit." *In re Bender,* 844 N.E.2d 170, 180 n. 10 (Ind.Ct.App.2006). The personal representative of an estate is regarded as a trustee appointed by law for the benefit of and the protection of creditors and distributees of that estate. *Bender,* 844 N.E.2d at 178. By acting in the capacity of personal representative and renting to himself the farmland he held in his life estate at an amount less than one-third of the fair market rental value, we agree with the trial court that Ken engaged in self-dealing.

Further, as Lorraine notes, the trial court "did not hold the Personal Representative to" a standard of maximizing estate income, inasmuch as it ordered that he pay a fair market rent in an amount at the midpoint between the reasonable rent amounts testified to by Bucher. Lor-

raine's Br. at 25). Ken does not contend that rent of $12,000 yearly is not a fair market value for the farmland that is the subject of his life estate, and the trial court's order did not require Ken to "maximize" the rental income by charging the highest possible fair market value. Therefore, Ken's second argument fails.

## 3. *Late Objection by Lorraine*

■ Next, Ken argues that the trial court's order should be reversed because Lorraine failed to raise her objection until four years after Mrs. Scholz's death, during which time he continued to farm the land under "exactly the same terms as he had been farming" for more than twenty years. Ken's Br. at 17. Therefore, he asserts, Lorraine "should not" in late 2005 "be able to accumulate four (4) years of charge backs." *Id.*

Ken provides no authority for this argument. Further, there is no evidence in the record that Lorraine had notice of the amount of rent that Ken, as life estate holder, was paying to the estate until July 7, 2005, when Ken filed the personal representative's final accounting. We have found that a beneficiary cannot waive "the right to object" to an act of self-dealing by a personal representative when the personal representative had "failed to give notice" of that act. *Bender,* 844 N.E.2d at 184. After Ken gave notice of the amount of rent being paid to the estate on July 7, 2005, Lorraine filed her objection on August 1, 2005. Therefore, this argument by Ken also fails.

## 4. *Consent by the Majority*

■ Finally, Ken argues that he may not be "held accountable" as personal representative "for decisions made with the consent of the majority of beneficiaries," namely, himself and Shirley. Ken's Br. at 19. His only authority for this argument is "by analogy" to cite the Business Corporation Act. *Id.* We are not persuaded.

As already noted, by law, the personal representative acts as a trustee with respect to protecting benefits and interests of the beneficiaries. *Bender*, 844 N.E.2d at 178. As personal representative, Ken had a duty to protect and serve the interests of both his siblings—not just the one who agreed with him. Further, when construing the language of a will, we seek to determine the intent of the testator, and we do that by looking at the language used in the will itself. *Kelly*, 788 N.E.2d at 935. Mrs. Scholz intended that all the surviving siblings share equally in the annual equitable income from the farm. Neither the law nor the will authorize Ken, as personal representative, to enter into an arrangement for his own benefit based upon the consent of himself and one sibling when that arrangement is to the detriment of a third sibling's interest.

We affirm.

NAJAM, J., and FRIEDLANDER, J., concur.