### NOBLESVILLE REDEVELOPMENT COMMMISSION, Appellant (Plaintiff Below),

v.

### NOBLESVILLE ASSOCIATES LIMITED PARTNERSHIP, an Indiana Limited Partnership, Joe Faulkner, Von Blankenbaker, Noblesville Development Company, an Indiana General Partnership, Mercantile Bank of St. Louis National Association, Stop One Holding Corp., Inc. and The Kroger Co., an Ohio Corp., Appellees (Defendants Below).

No. 29S02–9509–CV–1094.

Supreme Court of Indiana.

Dec. 31, 1996.

Jack G. Hittle, Noblesville, for Appellant.

A. Donald Wiles, II, Patricia Polis McCrory, Douglas A. Tresslar, Indianapolis, for Appellees.

SHEPARD, Chief Justice.

Private guarantors who were parties to a tax incremental financing scheme eventually defaulted, and the public body sued the guarantors and the subject real estate to "foreclose a lien." The trial court held that the guaranty was not a lien and entered judgment for the guarantors. The Court of Appeals reversed, holding that the guaranty created an equitable lien. We grant transfer and affirm the trial court.

## I. Facts

The well-pleaded facts show that in December 1989 the Noblesville Redevelopment Commission and the Noblesville Redevelopment Authority, existing pursuant to chapters 36–7–14 and 36–7–14.5 of the Indiana Code, respectively, entered into a written agreement with Von Blankenbaker, Joe Faulkner and Noblesville Associates Limited Partnership, (collectively referred to as "the Guarantors" unless a distinction is warranted) to finance a redevelopment project. The project included the extension of Noblesville's Logan Street from State Road 19 to State Road 38.

Financing for the new roadway was planned to occur in three stages. First, the Authority would sell municipal bonds to raise the capital. Second, to repay the bonds, the Authority would lease the lands it acquired in the redevelopment area to the Commission. Finally, the Commission would acquire funds to make its lease payments through various means. One such means was "tax increment financing," by which the increase in tax revenue generated in the redeveloped area is designated towards paying for expenses of the project, in this case towards the lease payments.[1] To insure the Commission's ability to make the lease payments, the Guarantors guaranteed that two parcels of land in one of the redevelopment areas would generate $93,500 in increased tax revenue in 1992.[2] These parcels were described in "Schedule C," which was attached to the Guaranty Agreement. If the parcels did not generate incremental revenue increases at the guaranteed level, the agreement required the Guarantors to supply the difference.

The parcels did not generate any tax increment at all in 1992. The Commission made a written demand to the Guarantors for $93,500, but the Guarantors defaulted, claiming inability to make the payment. The Commission then filed a two-count complaint in the Hamilton Superior Court. Count I demanded a money judgment against the Guarantors on the grounds that they guaranteed $93,500 in tax increment revenue and failed to remit payment. Count II alleged that the written Guaranty Agreement created a lien on one of the Schedule C parcels the Guarantors owned when the agreement was signed but subsequently transferred to Noblesville Development Company. Count II named Noblesville Development Company and Mercantile Bank of St. Louis[3] parties to the action "to assert whatever interest [they] may have in the real estate" (R. at 21). The complaint prayed for an order that would:

(1) declare the lien to be valid against the real estate; (2) determine the priority of interests in the real estate; and (3) allow the Commission to foreclose on the lien and sell the property to satisfy the Guarantors' obligation. Per Indiana Trial Rule 9.2(A), the Guaranty Agreement at issue was attached to the complaint and became part of the pleadings.

NDC filed a motion for judgment on the pleadings. It argued that no language in the Guaranty Agreement created a lien on the land as security for the Guarantors' obligations. The Commission responded that factual issues regarding the creation of a lien by the agreement were sufficient at either law or equity to warrant denial of the motion.

At a hearing on NDC's motion, the Commission advanced the same lien argument contained in its response and also argued that the guarantee, if not creating a "lien" per se, created some other kind of "encumbrance or covenant" on the land. The Commission claimed this ethereal encumbrance entitled it to proceed to trial so it could introduce evidence as to what this other "encumbrance" might be. Although the Commission advanced this vague new argument, it did not attempt to amend its complaint to state what this alternative encumbrance might be. Nor did it address what relief might be an appropriate alternative to foreclosure and sale.

Upon the pleadings before it, the trial court found that the Guaranty Agreement did not create a lien, at law or in equity, on NDC's real estate. NDC was thus entitled to a judgment on the pleadings because the Commission could not force a sale of the land to satisfy the obligation of the Guarantors without a lien.

The Commission filed a motion to correct errors. It conceded that the guarantee did not contain language creating a lien. It ar-

---

1. For an overview of tax increment financing and the policy issues surrounding it, see Catherine Michel, Note, *Brother, Can you Spare a Dime: Tax Increment Financing in Indiana,* 71 Ind.L.J. 457 (1996).

2. The agreement also provided guarantees for calendar years 1993 and 1994 in the amounts of $124,542 and $187,000, respectively. These amounts were to be reduced by $7,600 if the Guarantors were unable to acquire another piece of real estate described in Schedule A of the Guaranty Agreement.

3. Mercantile Bank had made a loan to NDC which was secured by a mortgage on the land.

gued, however, that the trial court's judgment was erroneous because Count II had "sought alternate relief" in addition to foreclosure. In its Brief in Support of Motion to Correct Error, the Commission articulated what that alternative relief might be: a covenant running with the land. The trial court, however, denied the Commission's motion.

On appeal, the Commission argued that "whether or not it is labeled as a lien, the guaranty does contain what is in substance a covenant which runs with the land and that the allegations of the complaint permit relief upon this theory." *Noblesville Redevelopment Com'n v. Noblesville Associates Ltd. Partnership,* 646 N.E.2d 364, 367 (Ind.Ct. App.1995). The panel on appeal staked out three positions, including a declaration that reversal was warranted because "upon the well-pleaded facts, the Commission may be entitled to equitable relief." *Id.* at 367. The lead opinion mentioned three possible theories of equity under which the Commission might succeed: equitable servitude, equitable lien, and simply the maxim "that is deemed done that ought to be done." *Id.* at 371. We grant transfer.

## II. Standard of Review

A trial court should grant a Trial Rule 12(C) motion for judgment on the pleadings only when it is clear from the face of the pleadings that the plaintiff cannot in any way succeed under the operative facts and allegations made therein. *Culver–Union Township Ambulance Service v. Steindler,* 629 N.E.2d 1231, 1235 (Ind.1994). When reviewing the grant of a 12(C) motion, the reviewing court accepts as true the well-pleaded material facts alleged in the complaint, *id.,* and "is confined solely to the pleadings to make [its] determination." *Gregory & Appel, Inc. v. Duck,* 459 N.E.2d 46, 49 (Ind.Ct.App.1984). Therefore, our review of the trial court's decision is based upon the complaint, answers, and Guaranty Agreement, and not on extraneous material alleged after the pleadings closed.

## III. The Guaranty Agreement Did Not Create a Lien

Well-settled Indiana law holds that a trial court determines the force and effect of a written instrument. *Leviston v. Junction Railroad Co.,* 7 Ind. 597 (1856). When there is no conflicting evidence relating to the construction of a written instrument, a court may direct a verdict according to the legal effect of the instrument. *Moss v. Witness Printing Co.,* 64 Ind. 125 (1878); *Kizziah v. Kizziah,* 651 N.E.2d 297 (Ind.Ct.App. 1995). The fact finder determines the facts upon which a written agreement rests (rather than the court) only where the agreement is both ambiguous and its interpretation requires extrinsic evidence. *Tate v. Secura Ins.,* 587 N.E.2d 665 (Ind.1992). Likewise, when a writing's terms are not ambiguous, the issue of whether or not its terms create a lien is an objective determination to be made by the trial court.

To create a lien by written contract, the language of the contract should *clearly indicate* the parties' intention to create a lien on the specific property at issue. *Carmichael v. Arms,* 51 Ind.App. 689, 100 N.E. 302 (1912). As with liens at law, where the existence of an equitable lien depends on construction of a written contract based on valuable consideration, a lien may be declared where the intent to secure an obligation with the subject property is clear on the face of the agreement. *Id.,* 100 N.E. 302. In short, the intent to create a lien must be objectively clear. If it is not, then no lien exists at law or equity.

The requirement of objective evidence within the four corners of the writing showing the parties' clear intent to create a lien is supported by sound policy principles. Indiana favors the free alienability and development of land. *First Federal Savings Bank of Indiana v. Key Markets, Inc.,* 532 N.E.2d 18 (Ind.Ct.App.1988). Liens burden the alienability and development of land by taking priority over subsequent mortgages. With less than full value available as collateral, lenders are less likely to loan money for the encumbered land's purchase or improvement, thus reducing economic growth and revitalization. In addition to fostering the alienability of land, Indiana's relatively brightline rule governing the creation of liens leads to greater specificity and heightened

care in drafting written instruments. It also reduces transaction costs incurred in litigation to interpret ambiguous contract language.

Review of the Guaranty Agreement's language does not reveal any intent, let alone a clear intent, to create a lien on the land described in Schedule C. The Commission points to Section 2.4 of the agreement, which reads: *"Covenant Running with the Real Estate.* The Guaranty shall be binding upon any successor in interest to the Guarantor particularly in regard to the following described real estate: (See Schedule C)". If anything, this language indicates an intention to create a personal obligation that would travel with the land and bind its current owner, instead of the original promisor, to that obligation. It clearly does not, however, create a security interest in the land for the satisfaction of that obligation.

Neither Section 2.4, nor any other provision in the agreement, contains the words "lien" or "mortgage," or states that the Guarantors' obligation is secured by the land, or states that the land will be sold to satisfy the Guarantors' obligation in the event of default or says that the property owner transfers or conveys any security interest in the land to the Commission. While this list is not exhaustive of possible statements showing clear intent to create a lien, the presence of one or more of these examples would be persuasive evidence of such intent. The parties to the Guaranty Agreement did intend to create something, but that something was not a lien against the Schedule C property.

Because the agreement did not create a lien, the Commission was not entitled to a foreclosure and sale on the land owned by NDC. Judgement on the pleadings was warranted.

### IV. The Complaint Did Not Make a Claim for Any Other Relief

The Commission argues that the trial court erred because even if the agreement did not create a lien as a matter of law, its complaint requested "alternate relief." In its motion to correct error the Commission stated:

> The Judgment Entry of this Court, on the Motion for Judgment on the Pleadings, should be clarified, amended or rescinded for the reason that the Plaintiff, in Count II of the Complaint, sought alternate relief. In Count II, the Plaintiff seeks a general Judgment, and also specifically sought an Order of Foreclosure of a Lien. The Plaintiff would concede that there is insufficient language to foreclose a "Lien." However, the Plaintiff submits that the incumbrance or covenant created by Section 2.3[4] of the Guaranty is sufficiently stated and pled to entitle the Plaintiff to proceed to Trial against all Defendants and to introduce evidence as to the effect of such covenant or encumbrance.

Trial Rule 8 defines the general rules of pleading. It states that "a pleading must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief, and ... a demand for the relief to which the pleader deems entitled. Relief in the alternative or of several different types may be demanded." Ind.Trial Rule 8(A).

Trial Rule 8(A) is representative of the changes that took place in 1970 when Indiana moved from code, or theory, pleading to the system of "notice pleading." *See generally Palacios v. Kline,* 566 N.E.2d 573, 576 (Ind.Ct.App.1991). Whereas theory pleading required the complaint to delineate a specific legal theory to which the plaintiff would adhere throughout the trial, notice pleading "merely requires pleading the operative facts so as to place the defendant on notice as to the evidence to be presented at trial." *Id.* (citing 1 William Harvey, Indiana Practice § 8.3, at 373 (1988)); *see also State v. Rankin,* 260 Ind. 228, 230–31, 294 N.E.2d 604, 606 (1973). Therefore, under notice pleading the issue of whether a complaint

---

4. Section 2.3 states,

This Guaranty Agreement shall be binding upon and inure to the benefit of the Guarantors, the [Authority], the [Commission], provided, however, that the Guarantors may not make or suffer to be made any assignment of this Guaranty Agreement without the prior written approval of the [Commission] unless the Guarantors remain liable and bound by this Guaranty Agreement in which event the [Commission's] approval is not needed.

(R. at 29–30.)

sufficiently pleads a certain claim turns on "whether the opposing party has been sufficiently notified concerning the claim ... so as to be able to prepare to meet it." Jack H. Friedenthal, et al., Civil Procedure § 5.7, at 253 (2nd Ed.1993). As our Court of Appeals has stated, "A complaint's allegations are sufficient if they put a reasonable person on notice as to why plaintiff sues." *Capitol Neon Signs, Inc. v. Indiana Nat'l Bank*, 501 N.E.2d 1082, 1085 (Ind.Ct.App.1986).

Count II of the Commission's complaint alleges:

(1) that "the obligation of the Guarantors is secured by a lien against the real estate as described in the Guaranty Agreement," (R. at 20–21);

(2) that NDC was made a party "to assert whatever interest it may have in the real estate," (R. at 21);

(3) that NDC had actual knowledge of the existence of the Guaranty before it acquired its interest in the real estate, (R. at 21–22); and

(4) that NDC's parcel of land is the only parcel of real estate available to secure the performance of the obligations of the Guarantors, (R. at 22).

From these operative facts, NDC would only believe that it was involved in this case to defend an *in rem* action against property it owns. Nothing stated above would lead NDC to believe that the Commission was bringing an action against NDC itself,[5] seeking a monetary judgment against NDC because of NDC's status as owner of land described in Schedule C of the agreement.[6] Because the complaint does not contain notice regarding any alternate claim the Commission might have against NDC, as opposed to NDC's land, NDC cannot be "required to anticipate and defend against such a claim."

*Briggs v. Finley*, 631 N.E.2d 959, 964 (Ind. Ct.App.1994).

■■■ The Guaranty Agreement contains language which would support a colorable claim that the agreement created a covenant running with the land. The attachment of the agreement to the complaint, however, does not cure the complaint's failure to put the defendants on notice concerning any claim about a covenant running with the land.

■■■■ The two claims differ significantly enough that fairness requires that notice of both be evident in the complaint. First, defense against a covenant claim would require research, evidence, arguments, and litigation strategy different from the lien-based claim. Second, under the lien claim NDC stands to lose just the land, not the value of the land. An adverse judgment under a covenant claim, however, because it is a *quasi in rem* action, could render NDC directly liable for all tax increments guaranteed by the Guarantors and could attach not only to the land, but to all assets of NDC. Such a difference in liability could affect the way NDC allocates its resources in the defense of this case. For the defendant to make efficient and educated legal decisions regarding its case, the complaint must put the defendant on notice concerning why it is potentially liable and what it stands to lose. One of the main functions of pleading is to give notice to the parties of the nature of the claims and defenses, in order to help them prepare their cases. Gene R. Shreve & Peter Raven–Hansen, Understanding Civil Procedure 171 (1989).

■■■■ The complaint itself, and not simply the written instrument attached thereto pursuant to Trial Rule 9.2(A), must give the

---

**5.** Count II's inclusion of the Mercantile Bank of St. Louis National Association without any distinction between it and Noblesville Development Corporation provides further proof that this count only seeks to foreclose a supposed lien on the property and nothing more. Such an action would make Mercantile Bank's presence necessary, because it has a security interest in the land at issue. Mercantile Bank's presence would not be relevant to an action founded on a covenant running with the land, however, because its status as lien holder would not be relevant to the

issue of who is burdened with the Guaranty Agreement's obligation.

**6.** In fact, Count I, the count which alleges who is responsible for the deficiency, only mentions the Guarantors and fails to state an alternative claim for personal liability in NDC, which would be the appropriate claim if one were advancing an alternative claim about a covenant running with the land.

defendant some minimal notice of the plaintiff's claim. A request for a "general judgment" is not enough. The Commission's complaint failed to give such notice to NDC regarding the covenant running with the land claim. Therefore, the trial court was correct not to consider that claim when ruling on NDC's motion for a judgment on the pleadings.[7]

 "A decree in equity, like a judgment at law, cannot stand when it has no pleading to support it." *McKenna v. Turpin*, 128 Ind.App. 636, 641, 151 N.E.2d 303, 305 (1958). As to Noblesville Development Company and the Mercantile Bank of St. Louis, the pleadings claimed only that the Guaranty Agreement created a lien on NDC's land upon which the Commission sought foreclosure and sale of the land. Because, as a matter of law, the Guaranty Agreement does not create a lien at law or in equity, judgment on the pleadings as to Count II of the complaint was appropriate.

Accordingly, we affirm the judgment of the trial court.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.

---

7. The ready availability of Trial Rule 15's provisions for amending one's complaint further weakens the Commission's position. After the opposing party has served its responsive pleading, Trial Rule 15(A) allows a party, by the court's leave, to amend its complaint to adequately reflect alternate claims, and such leave *must* be granted "when justice so requires." T.R. 15(A). The Commission never attempted to amend its complaint to reflect its covenant claim. In its response to NDC's motion for judgment on the pleadings, the Commission simply reiterated its lien argument. At the hearing on NDC's motion, the Commission alluded that the Guaranty Agreement might have created something other than a lien on NDC's property, but did not attempt to amend its complaint to allege what that might be. After the trial court granted judgment on the pleadings, the Commission finally realized the alternate claim it wished to seek, but even then did not ask the court for leave to amend its complaint, arguing instead in its motion to correct error that its new theory was sufficiently pled in its original complaint. A motion to correct error is not the appropriate place to assert a claim against a defendant for the first time. *Cf. Briggs*, 631 N.E.2d at 964 ("A memorandum opposing summary judgment is not a proper place to assert a claim against a defendant.")