

FILED

Jul 22 2015, 10:19 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Attorneys for Cheryl Underwood
Arend J. Abel
Michael W. McBride
Cohen & Malad, LLP
Indianapolis, Indiana

Attorney for Thomas Bunger as Personal
Representative of the Estate of Kenneth
K. Kinney
Scott D. Pankow
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

E. Paige Freitag
Jones, McGlasson & Freitag, P.C.
Bloomington, Indiana

Thomas E. Densford
Bauer & Densford
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Thomas Bunger as Personal
Representative of the Estate of
Kenneth K. Kinney, and

Cheryl Underwood,

*Appellants-Defendants,*

v.

Sheree Demming,

*Appellee-Plaintiff.*

July 22, 2015

Court of Appeals Case No.
53A01-1409-PL-395

Appeal from the Monroe County
Circuit Court; the Honorable Erik
Allen, Special Judge;
53C06-0704-PL-873
53C01-0704-PL-873

**May, Judge.**

Cheryl Underwood, a real estate broker, and the estate of her business partner Kenneth Kinney appeal a judgment for Sheree Demming. We affirm in part, reverse in part, and remand.

## Facts and Procedural History

We summarized the facts[1] of this case in *Demming v. Underwood*, where we reversed summary judgment for Underwood and Kinney and remanded for further proceedings:

> Demming is a real estate investor in the business of acquiring properties in the Bloomington, Indiana area for remodeling, renovation, leasing, and sale. Demming, who has never held a realtor's license, engaged Underwood's professional services as a realtor to buy and sell properties on multiple occasions between July 2002 and April 2007. During this time, Demming routinely discussed her real estate investment strategy with Underwood, including her plans to acquire multiple properties within a "target zone" near the Indiana University campus.

> In 2002, Demming became particularly interested in purchasing two properties located within her target zone at 424 and 426 East Sixth Street ("the Properties"). The Properties were owned by Marion and Frances Morris ("the Morrises"), who lived out of state. Realtor Julie Costley ("Costley") managed the Properties, which were not listed for sale. After discussing Demming's interest in acquiring the Properties, Demming and Underwood agreed that the best strategy would be for Underwood to approach Costley with an offer on behalf of Demming,

---

[1] As that was an appeal from a summary judgment, we presented the facts as those "most favorable to the non-moving party," which was Demming. *Demming v. Underwood*, 943 N.E.2d 878, 882 (Ind. Ct. App. 2011). As Demming later prevailed at trial, our standard of review again calls for a statement of facts in Demming's favor. *See, e.g.*, *Jay Myoung Yoon v. Sunsook Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999) (when trial court's order includes findings of fact and conclusions of law pursuant to Trial Rule 52, we do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment).

because as a realtor, Costley would be obligated to relay an offer presented by another realtor to the Morrises.

[5] Underwood first presented an offer to Costley on Demming's behalf in the fall of 2002. After the offer was declined, Demming and Underwood "strategized" together on how Demming could acquire the Properties, and Underwood offered to contact Costley every few months to inquire about the Properties' availability. Over the next few years, up until early 2007, Underwood contacted Costley on Demming's behalf regarding the Properties "every four of [sic] five months." Additionally, in May, August, and October 2006, Underwood contacted Costley to inquire into the availability of the Properties after Demming specifically instructed her to do so. While Underwood was not compensated for these services, "it was discussed and understood that . . . Underwood would be paid a real estate commission, at closing, in the customary amount of seven percent (7%) of the sales price." However, unbeknownst to Demming, Underwood became interested in purchasing the Properties for herself after she acquired a neighboring property in May 2006.

[6] In February 2007, Demming again instructed Underwood to call Costley and inquire into the availability of the Properties for purchase. Underwood responded, "Sheree, she's just not going to sell." Demming nevertheless insisted that Underwood contact Costley, and said that if Underwood refused, she would contact Costley herself. Underwood then agreed to call Costley, and when she did so, she asked Costley to contact Mrs. Morris, whose husband had recently passed away, to find out if she would be interested in selling. Costley responded that she would contact Mrs. Morris, but she expressed doubt as to whether Mrs. Morris would be willing to sell. The next day, Underwood told Demming that the Properties were not for sale. Demming instructed Underwood to "stay on it" because she believed that Mrs. Morris would be willing to sell in the near future.

[7] A few days later, Costley contacted Mrs. Morris, who instructed her to request that anyone interested in purchasing the Properties tender a written offer. When Costley informed Underwood that Mrs. Morris was willing to entertain an offer, Underwood did not relay this information to Demming. Instead, on March 9, 2007, Underwood and Kinney, acting as partners, tendered their own written offer to purchase the Properties. A counteroffer was tendered and accepted, pursuant to which Underwood and Kinney agreed to purchase the

Properties for $650,000. Underwood and Kinney closed on the transaction on March 30, 2007.

On April 14, 2007, Demming contacted Underwood after noticing one of Underwood's "For Rent" signs in front of the Properties. Underwood and Demming met the next day, and Underwood informed Demming that she and Kinney had purchased the Properties.

On April 19, 2007, Demming filed suit against Underwood asserting claims for breach of fiduciary duty and constructive fraud. Demming also requested the imposition of a constructive trust compelling Underwood and Kinney to convey title of the Properties to her.

943 N.E.2d 878, 882-83 (Ind. Ct. App. 2011) (citations omitted), *reh'g denied, trans. denied.*

[8] The trial court in *Demming* granted summary judgment for Underwood and Kinney on all claims. It determined, among other things, that there was no agency relationship between Demming and Underwood as a matter of law. Demming appealed, and we reversed on various grounds, including that there were genuine issues of material fact as to whether there was an agency relationship. *Id.* at 888.

[9] On remand a trial was conducted and judgment was entered for Demming. The trial court imposed a constructive trust in Demming's favor on the property based on the "existence and breach of an agency relationship between [Demming] and [Underwood], Underwood's breach of common law, statutory and fiduciary duties that Underwood owed to Demming and Underwood's fraudulent and deceptive conduct as well as the vicarious partnership liability imposed upon [Kinney]." (Appendix of Appellant Cheryl Underwood

(hereinafter "Underwood App.") at 42). It awarded Demming damages, prejudgment interest, and attorney fees.

# Discussion and Decision

[10] After the trial on remand, the trial court entered findings of fact and conclusions thereon. When a trial court does so pursuant to Indiana Trial Rule 52, we apply the following two-tier standard of review: whether the evidence supports the findings of fact, and whether the findings support the conclusions. *Crider v. Crider*, 15 N.E.3d 1042, 1052 (Ind. Ct. App. 2014), *trans. denied.* We will set aside findings of fact only if they are clearly erroneous, which occurs if the record contains no facts to support a finding either directly or by inference. *Id.* We defer to the trial court's ability to assess the credibility of witnesses and will not reweigh the evidence, and we must consider only the evidence most favorable to the judgment along with all reasonable inferences drawn in favor of the judgment. *Id.* It is not enough that the evidence might support some other conclusion; it must positively require the conclusion contended for by appellant before there is a basis for reversal. *Id.* A judgment also is clearly erroneous if it relies on an incorrect legal standard, and we do not defer to a trial court's legal conclusions. *Id.*

### *Common-Law Agency Relationship*

[11] The trial court's determination that Underwood and Demming had an agency relationship is not clearly erroneous. An agency relationship is one that results from a "manifestation of consent by one person to another that the other shall

act on his behalf and subject to his control, and consent by the other so to act." *Turner v. Bd. of Aviation Comm'rs*, 743 N.E.2d 1153, 1163 (Ind. Ct. App. 2001) (quoting *Dep't of Treasury v. Ice Serv. Inc.,* 220 Ind. 64, 67–68, 41 N.E.2d 201, 203 (1942)), *trans. denied.* It arises from the consent of the parties in the form of a contractual agreement, but it is not necessary that the contract or the authority of the agent to act be in writing. *Id.* It is necessary that the agent be subject to the control of the principal with respect to the details of the work. *Id.*

[12]  To establish an agency relationship, three elements must be shown: (1) manifestation of consent by the principal, (2) acceptance of authority by the agent, and (3) control exerted by the principal over the agent.[2] *Demming*, 943 N.E.2d at 883. These elements may be proven by circumstantial evidence. *Id.* Whether an agency relationship exists is generally a question of fact. *Id.*

[13]  In *Demming*, we determined the evidence that Underwood made multiple inquiries into the availability of the Properties on Demming's behalf over a period of more than four years supported an inference that Underwood agreed

---

[2] Underwood does not address the elements of an agency relationship we articulated in *Demming*. Instead, relying on decisions addressing real estate broker employment contracts, she argues she was not Demming's agent because "there was no consideration and no meeting of the minds on the essential terms of the agreement." (Br. of Appellant Cheryl Underwood (hereinafter "Underwood Br.") at 15.) We decline Underwood's invitation to engraft onto the elements of an agency relationship as articulated in *Demming* the additional contract elements of consideration and meeting of the minds. *See Restatement (Third) Of Agency* § 1.01 (2006) ("the consensual aspect of agency does not mean that an enforceable contract underlies or accompanies each relation of agency").

to act as her agent and created a genuine issue of material fact precluding summary judgment:

> After first becoming interested in purchasing the Properties in 2002, Demming asked Underwood to approach Costley with an offer to purchase, and Underwood complied. After that offer was rejected, Demming and Underwood devised a plan for Demming to acquire the Properties. In accordance with this plan, Underwood approached Costley every few months to inquire into the Properties' availability for purchase. In May, August, and October 2006, and again in February 2007, Underwood contacted Costley to inquire into the availability of the Properties after Demming specifically instructed her to do so. This evidence, when taken together, supports an inference that Underwood agreed to act as Demming's agent for the purpose of acquiring the Properties.

*Id*. at 884.

[14] We also determined there was an issue of fact as to whether Demming exerted sufficient control over Underwood. *Id*. at 885. To satisfy the control element, "[i]t is necessary that the agent be subject to the control of the principal with respect to the details of the work." *Id*. (*quoting Turner,* 743 N.E.2d at 1163). However, the principal need not exercise complete control over every aspect of the agent's activities within the scope of the agency. *Id*.

[15] We noted Demming instructed Underwood to make contact with Costley and Underwood complied:

> Moreover, Demming did more than just dictate the desired result of the agency, *i.e.* Demming's purchase of the Properties. She also dictated the strategy by which Underwood was to accomplish this result, namely, by continually contacting Costley, who would in turn contact the owners.

[16]    While it is true that Demming did not give Underwood the authority to negotiate the purchase of the Properties without further consultation, this fact does not establish a lack of control on Demming's part. Indeed, when this evidence is properly construed in favor of Demming in accordance with our standard of review, it gives rise to the inverse inference that Demming had the right to exercise extensive control over the details of Underwood's performance, including when and how to make an offer to purchase. We therefore conclude that the designated evidentiary materials create a genuine issue of material fact regarding whether Demming exercised sufficient control over Underwood's activities to support the existence of an agency relationship.

*Id*. at 884-85.

[17]    On remand, the evidence before the trial court permitted its determination Underwood was Demming's agent. Since 2002, Demming had, on several occasions, engaged Underwood's services as a real estate broker. Because of that prior relationship, Demming testified "it was logical for me to then reach out to her and say, hey, I'd like to talk with you about these properties on Sixth Street that I'd like to purchase." (Tr. at 80.) Demming explained in her testimony why she believed the only way to have her offer presented to the owners of the properties "was by having a realtor represent me and present an offer . . . [a]nd that's what I respectfully did." (*Id*. at 78-79.) Underwood suggested to Demming that Underwood should contact Costley, who managed the Properties for the owner, "every four or five months on [Demming's] behalf from Two Thousand Two on." (*Id*. at 121.) Deming testified Underwood "sat in my living room with me and strategized about the best way I could get those properties." (*Id*.) Underwood would have been paid a commission had Demming acquired the properties. Demming presented sufficient evidence to

permit the trial court's determination Demming manifested her consent to the agency relationship, Underwood accepted the authority, and Demming exerted control over Underwood as her agent.

*Statutory Agency Relationship*

[18] An agency relationship between Demming and Underwood was not precluded by an Indiana Code provision addressing whether a real estate licensee has an agency relationship with an individual:

> A licensee has an agency relationship with, and is representing, the individual with whom the licensee is working unless:
>
> (1) there is a written agreement to the contrary; or
>
> (2) the licensee is merely assisting the individual as a customer without compensation.

Ind. Code § 25-34.1-10-9.5(a). The trial court determined the services Underwood provided "exceed the casual services which may be provided by a real estate broker to merely assist an individual as a customer without compensation." (Underwood App. at 38.)

[19] We analyzed this "nearly opaque" statute in *Demming*, 943 N.E.2d at 888-90. There, the trial court concluded as a matter of law that no statutory agency relationship was formed between Demming and Underwood. On appeal, we determined there was an issue of fact as to that question:

[20] > The interpretation of a statute is a pure question of law and is reviewed under a *de novo* standard. *Herron v. State,* 729 N.E.2d 1008, 1010 (Ind. Ct. App. 2000), *trans. denied.* In statutory construction, our primary goal is to ascertain and give effect to the intent of the legislature. *Gray v. D & G, Inc.,* 938 N.E.2d 256, 259 (Ind. Ct. App. 2010). The

language of the statute itself is the best evidence of legislative intent, and we must give all words their plain and ordinary meaning unless otherwise indicated by statute. *Id.*

[21] Moreover, statutes in derogation of common law will be strictly construed, particularly when the statute affects a common-law right or duty. *Bartrom v. Adjustment Bureau, Inc.,* 618 N.E.2d 1, 10 (Ind.1993). We presume that when the legislature enacts a statute, it is aware of the common law and does not intend to make any change in it beyond what it declares either in express terms or by unmistakable implication. *Id.* Thus, in cases of doubt, we will construe a statute as not changing the common law. *Id.*

[22] Turning to the task before us, we first note that the pertinent Indiana Code chapter is entitled Real Estate Agency Relationships ("the Agency Chapter"). Ind. Code ch. 25-34.1-10. Section 9.5(a) of the Agency Chapter provides that a real estate licensee has an agency relationship with the individual with whom the licensee is working, unless: "(1) there is a written agreement to the contrary; or (2) the licensee is merely assisting the individual as a customer without compensation." Neither party contends that Demming and Underwood had entered into any sort of written agreement. Thus, in order to determine that Underwood was not Demming's agent, we must conclude that Underwood was assisting Demming as a customer without compensation.

[23] The definition of "customer" within the Agency Chapter provides us with little guidance. "Customer" is defined in the negative, as "a person who is provided services in the ordinary course of business by a licensee but who is not a client." Ind. Code § 25-34.1-10-6 (2010). Thus, to classify Demming as a customer, we must exclude her as Underwood's client. A "client" is defined as "a person who has entered into an agency relationship with a licensee." Ind. Code § 25-34.1-10-5 (2010).

[24] These definitions highlight the perplexities inherent in the Agency Chapter. Section 25-34.1-10-9.5(a)(2) provides that a real estate licensee has an agency relationship with and is representing the person with whom the licensee is working unless the licensee is assisting that person as a customer without compensation. But a customer is someone who is not a client, and client is defined as someone who has entered into an agency relationship with a licensee. Thus, under

section 25-34.1-10-9.5(a)(2), a person with whom a licensee is working is a client unless he or she is not a client and is not paying for the licensee's services.

[25] Adding another layer of difficulty is Indiana Code section 25-34.1-10-0.5 (2010), which separately defines "agency relationship" as "a relationship in which a licensee represents a client in a real estate transaction." "Real estate transaction" is defined as "the sale or lease of any legal or equitable interest in real estate." Ind. Code § 25-34.1-10-8 (2010).

[26] In concluding that Demming was merely a customer, the trial court rested on the statutory definition of real estate transaction set forth in section 25-34.1-10-8. Specifically, the trial court found that "a 'cold call' to inquire whether certain real estate, not otherwise on the market, could be purchased is not 'the sale or lease any legal or equitable interest in real estate'; therefore, there was no 'real estate transaction.'" Appellant's App. p. 15. Likewise, the Defendants argue that Demming could not be Underwood's client because the Properties were not for sale when Underwood contacted Costley and, in their view, this precludes a conclusion that Underwood was representing Demming in a real estate transaction. Demming, however, argues that this conclusion constitutes an unduly restrictive interpretation of the statutory definitions of real estate transaction and agency relationship. We agree.

[27] In order to dispose of the issues before us on review of a granted motion for summary judgment, we need not fully explore the interplay between the presumption in favor of the existence of an agency relationship set forth in section 25-34.1-10-9.5 and the definition of agency relationship set forth in section 25-34.1-10-0.5, along with its requirement that the purported agent be representing the client in a real estate transaction. It is enough for us to note that the statutory definition of real estate transaction contains no requirement that the real estate at issue be listed for sale, and it is not our prerogative to engraft such a requirement into the statute. Thus, the fact that the Properties were not listed for sale at the time Underwood contacted Costley does not necessarily preclude a conclusion that Underwood was Demming's agent under the Agency Chapter.

[28] Furthermore, we disagree with the trial court's characterization of Demming and Underwood's relationship as one in which Underwood

merely made "a 'cold call'" to determine whether the Properties were available. Our evidence most favorable to Demming as the non-movant establishes that the two strategized together and formulated a plan for Demming to acquire the Properties. Pursuant to this plan, Underwood made multiple contacts with Costley to determine whether the Properties were available over a period of more than four years, all in furtherance of Demming's stated desire to purchase the Properties.

[29] This evidence easily supports an inference that Underwood was actively representing Demming in the pursuit of a real estate transaction that had not yet come to fruition. We conclude that this showing is sufficient to establish a genuine issue of material fact as to whether Underwood was representing Demming in a real estate transaction for the purposes of sections 25-34.1-10-0.5 and -8. To hold that no real estate transaction occurs and that, consequently, no agency relationship is established until a sale or lease of real estate is actually consummated would be to completely sever the statutory real estate agency relationship from its common law roots, a step we will not take in the absence of a clear contrary pronouncement from the legislature.

[30] The Defendants also make much of the fact that Underwood received no compensation from Demming for her repeated contacts with Costley. According to the Defendants, no agency can be formed under the Agency Chapter where a licensee merely performs gratuitous services. However, the plain language of the statute does not support this assertion. Although section 25-34.1-10-9.5(a)(2) provides that a real estate licensee has an agency relationship with the person with whom the licensee is working unless the licensee is assisting that person as a customer without compensation, there is no requirement that an individual compensate a licensee for his or her services in order to qualify as a client. *See* I.C. § 25-34.1-10-5. And in any event, review of the facts most favorable to Demming as the non-movant establishes that Underwood was to be paid in the customary manner for realtors; that is, she would receive a commission of seven percent of the purchase price at closing. Thus, Underwood's own action in purchasing the Properties for herself prevented her from being compensated. For all of these reasons, we conclude that the trial court erred when it concluded as a matter of law that no statutory agency relationship existed between Demming and Underwood.

*Demming*, 943 N.E.2d at 890 (footnote omitted).

[31] We cannot find erroneous the trial court's determination Underwood provided services beyond merely "assisting [Demming] as a customer without compensation." As explained above, Demming engaged Underwood to help her pursue the purchase of the Properties because she believed she needed a real estate broker to present an offer the sellers would consider. Underwood made a number of inquiries on Demming's behalf over a period of several years. There was evidence Demming would have paid Underwood a standard commission had Underwood negotiated a purchase for Demming. Ind. Code § 25-34.1-10-9.5(a) does not preclude the trial court's determination Underwood was Demming's agent.

### Broker's Duty

[32] Ind. Code § 25-34.1-10-11 provides:

> A licensee representing a buyer or tenant may: (1) show properties in which the buyer or tenant is interested to other prospective buyers or tenants and may show competing buyers or tenants the same property or assist other buyers or tenants in purchasing or leasing a particular property without breaching any duty or obligation to the buyer or tenant.

[33] Underwood argues the term "other prospective buyers" is general enough to include herself as the licensee, so she could buy the properties without breaching any duty to Demming. Underwood relies on *Turner v. Kent*, 15 N.E.3d 67, 71 (Ind. Ct. App. 2014) (in construing statutes, "[w]ords are to be given their plain, ordinary, and usual meaning," and "[i]t is just as important to

recognize what the statute does not say as it is to recognize what it does say"), *trans. denied*.

[34] We rejected Underwood's argument in *Demming*. There, as here, Underwood argued that because the plain meaning of the statute does not prohibit the practice, it must necessarily permit it. We "strongly disagree[d]." 943 N.E.2d at 891.

[35]     Under our common law of agency, it is axiomatic that an agent has a duty to act solely for the principal's benefit and may not place herself in a position where her own interests are potentially antagonistic to those of the principal. In enacting section 25-34.1-10-11(e), the legislature made no clear declaration or unmistakable implication that it intended to abandon this fundamental principle and allow real estate licensees representing buyers to purchase properties "out from under" their clients. Rather, the statute takes the smaller step of allowing real estate licensees to represent multiple buyers who are interested in the same parcel. And there is a good reason for this distinction; a licensee representing multiple buyers presumably has no personal stake in which buyer ultimately purchases the parcel, and therefore has no incentive to treat any of them unfairly. But if the licensee herself wishes to purchase the parcel, this desire introduces an element of competition between the licensee and client, and such a conflict of interest may lead to abuses by the licensee. We therefore conclude that Indiana Code section 25-34.1-10-11(e) does not allow a licensee representing a buyer to purchase properties during the course of the agency with respect to which he or she has acted as the buyer's agent and in which the client has expressed interest.

*Id*. at 891-92 (citations omitted). We decline to revisit our *Demming* analysis.

### *Calculation of Damages*

[36] Underwood argues the trial court erred in its calculation of damages because it included "partnership draws" as revenue and excluded "reasonable expenses"

in the form of Underwood's legal fees. (Underwood Br. at 22.) Generally, the computation of damages is a matter within the sound discretion of the trial court. *Marathon Oil Co. v. Collins*, 744 N.E.2d 474, 481 (Ind. Ct. App. 2001). A damage award will not be reversed upon appeal unless it is based on insufficient evidence or is contrary to law. *Id*. In determining whether the award is within the scope of the evidence, we may not reweigh the evidence or judge the credibility of witnesses. *Id*.

[37] Evidence of profits is not "open to the objection of uncertainty where there is testimony which, while not sufficient to put the amount beyond doubt, is sufficient to enable the [factfinder] to make a fair and reasonable finding with respect thereto." *Lees Inns of Am., Inc. v. William R. Lee Irrevocable Trust*, 924 N.E.2d 143, 160 (Ind. Ct. App. 2010) (quoting *Jerry Alderman Ford Sales, Inc. v. Bailey*, 154 Ind. App. 632, 652, 291 N.E.2d 92, 106 (1972), *clarified on other grounds on reh'g*), *trans. denied*. Doubts and uncertainties as to the proof of the exact measure of damages must be resolved against the defendant because justice and public policy require that the wrongdoer bear the risk of uncertainty that his own wrong has created. *Id*. The rationale for leniency in proving damages where a breach of duty has occurred is that the breaching party must be required to bear all the consequences of his conduct. *Id*.

[38] We cannot find an abuse of discretion. We note Underwood offers no legal authority in support of her argument other than citation to two decisions for the premise "net profits are defined as revenue less expenses." (Underwood Br. at 23) (citing *Indiana & Michigan Elec. Co. v. Terre Haute Indus., Inc.*, 507 N.E.2d 588

(Ind. Ct. App. 1987) *reh'g denied, trans. denied*, and *Arthur Jordan Co. v. Caylor*, 36 Ind. App. 640, 76 N.E. 419 (1905)). But that standard does not control in the case before us, where damages were awarded not for breach of contract, but for Underwood's breach of fiduciary obligations. In the latter situation, "when the basis of liability is a failure to conform to a fiduciary duty, the measure of damages is the entire loss sustained." *W & W Equip. Co. v. Mink*, 568 N.E.2d 564, 576 (Ind. Ct. App. 1991) *reh'g denied, trans. denied*. When a fiduciary misappropriates property, the victim is entitled to the property and "all the fruits of such property." *Winstandley v. Second Nat. Bank of Louisville, Ky.*, 13 Ind. App. 544, 41 N.E. 956, 957 (1895).

[39] While the trial court might have mischaracterized the basis for its calculation of damages as "net profits," (Underwood App. at 52), we cannot find the trial court erred to the extent it determined the "partnership draws" should be included as the "fruits" of the property Underwood and Kinney misappropriated. "Partnership draw is nothing more than a form of compensation whereby partners, pursuant to an agreement, take money from a partnership drawing account on a periodic basis as salary or as a share of profits from the enterprise." *Gerst v. Gerst*, 135 Misc. 2d 112, 113, 514 N.Y.S.2d 587, 587 (Sup. Ct. 1987).[3]

---

[3] Underwood asserts partnership draws have "no relationship to the income or expenses of a partnership. They can reflect returns of capital, the proceeds of refinancings, or repayment of loans the partners have made to a partnership. Nor are they any reliable evidence of what [Demming] supposedly lost by not owning the properties from 2007-2012." (Underwood Br. at 23.) Underwood offers no citation to the record or to

### *Attorney's Fees*

[40] The trial court determined Demming was entitled to attorney fees because of "fraudulent and deceptive conduct by Underwood and Kinney and a breach of fiduciary duties, in the context of a constructive trust." (Underwood App. at 56.) Kinney and Underwood argue that was error because the parties had no agreement regarding attorney fees and no statute provides for such an award in a situation like this.

[41] We review a decision to grant attorney fees for an abuse of discretion. *R.L. Turner Corp. v. Town of Brownsburg*, 963 N.E.2d 453, 457 (Ind. 2012). Indiana generally adheres to the American rule that a party must pay his own attorney fees absent an agreement between the parties, a statute, or other rule to the contrary. *Id.* at 458. "The right to recover attorneys' fees from one's opponent does not exist in the absence of a statute or some agreement, though a court of equity may, under some circumstances, allow attorneys' fees to be paid out of a fund brought under its control." *State Bd. of Tax Comm'rs v. Town of St. John*, 751 N.E.2d 657, 659 (Ind. 2001) (quoting *Gavin v. Miller*, 222 Ind. 459, 465, 54 N.E.2d 277, 280 (1944)). Equity permits an award of attorney fees under the

---

legal authority to support her assertion the partnership draws in the case before us were unrelated to the income from the Properties or should otherwise be excluded as the fruits of the misappropriation of the Properties. We therefore decline to reverse on that ground. *See* Indiana Appellate Rule 46(A)(8) ("The argument must contain the contentions of the appellant on the issues presented supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on."). A party waives an issue where the party does not develop a cogent argument or provide adequate citation to authority and portions of the record. *Smith v. State*, 822 N.E.2d 193, 202-03 (Ind. Ct. App. 2005), *trans. denied*.

circumstances before us, and we cannot say the award was an abuse of discretion.

[42] In *In re Bender*, 844 N.E.2d 170, 185 (Ind. Ct. App. 2006), *trans. denied*, we affirmed an award of attorney fees where a personal representative breached his fiduciary duty to an estate and the court had imposed a constructive trust to recover property the personal representative had improperly transferred from the estate. There, the probate court imposed a constructive trust to pull back into the estate property that had been improperly transferred from the estate.

[43] We noted a constructive trust is an equitable remedy:

> To fully compensate [the beneficiary] for the loss caused by [the personal representative's] breach of fiduciary duty in administering the Estate, equity demands that [the personal representative] should pay for the attorney fees incurred to prevent [the personal representative] from acting outside his fiduciary powers. Otherwise, the only deterrent to [the personal representative] acting outside the bounds of his powers is the chance that any improper transfer, and the profits derived therefrom, will be placed in a constructive trust. The probate court did not err in citing to the Trust Code[4] to support an award of attorney fees. A personal representative, like a trustee, is a fiduciary who acts on behalf of the beneficiary. It was proper for the probate court to conclude that attorney fees available for a fiduciary's

---

[4] We upheld the award of attorney fees in *Bender* even though there was nothing in the probate code that authorized the recovery of attorney fees in a case such as that one. But the trial court there noted "[w]hen a trustee commits a breach of trust, the trustee is liable to the beneficiary for reasonable attorney fees incurred by the beneficiary in bringing an action on the breach." 844 N.E.2d at 184 (citing Ind. Code § 30-4-3-11(b)). We went on to say that section of the trust code "applies to the fiduciary obligations of a personal representative to an estate, its creditors, and beneficiaries." *Id*. at 185 (citing *Fall v. Miller*, 462 N.E.2d 1059, 1062 (Ind. Ct. App. 1984)). As the trial court imposed a constructive trust as part of Demming's remedy, Underwood and Kinney were trustees too.

> wrongdoing in a trust are equally available for a fiduciary's
> wrongdoing in an estate, and that these fees should be paid by the
> fiduciary personally. The trial court did not err in granting attorney
> fees to be paid by [the personal representative] to [the beneficiary].

*Id*. (footnote added).

[44] Similarly, the trial court in the case before us imposed a constructive trust as a remedy for the breach of Underwood's and Kinney's fiduciary duties. An agency relationship is confidential and fiduciary, and the agent is obliged to exercise the utmost good faith. *Bopp v. Brames*, 713 N.E.2d 866, 871 (Ind. Ct. App. 1999), *trans. denied*. Unless otherwise agreed, an agent owes a duty to his principal to act solely for the principal's benefit. *Id*. We decline to find an abuse of discretion in the award of attorney fees to Demming.

### *Prejudgment Interest*

[45] The trial court awarded Demming prejudgment interest of $10,503.26. Underwood argues that was error because Demming did not make a qualified settlement offer. For the prejudgment interest statute to apply, a plaintiff must make a written offer of settlement to a party against whom the claim is filed within one year of filing the claim in court. Ind. Code § 34-51-4-6; *Wisner v. Laney*, 984 N.E.2d 1201, 1209 (Ind. 2012).

[46] Underwood asserts there was no such offer. Demming concedes prejudgment interest was not warranted, and asks us to "reduce the total judgment to $144,357.38, which equals the damages awarded less the prejudgment interest

portion." (Appellee's Br. at 32 n.2.) We accordingly remand so the trial court may recalculate the damages to exclude prejudgment interest.

### *Kinney's Notice of a Claim for Money Damages*

[47]    After we remanded for trial, Kinney moved for judgment on the pleadings on the ground he did not have adequate notice there was a claim against him for money damages.[5] The denial of his motion was not error.

[48]    The bench trial in this litigation was bifurcated. After the liability phase was completed, Kinney filed a "Motion for Judgment on the Pleadings as to any purported claim for money damages," (Appendix of Appellant Thomas Bunger as Personal Representative of the estate of Kenneth K. Kinney (hereinafter "Kinney App.") at 44), on the first day of the damages phase.[6] He alleged in his motion that Demming's only demand for relief against Kinney was an order transferring his interest in the Properties to Demming, and Demming sought money damages only from Underwood.

---

[5] Kinney died after the trial court entered its judgment and his estate was substituted as a party in this appeal.

[6] Demming filed her complaint on April 19, 2007. It appears Kinney filed his motion for judgment on the pleadings over six years later, on June 21, 2013, but the copy Kinney provided in his appendix does not have a file stamp. (Kinney App. at 44.)

   Ordinarily, a motion for judgment on the pleadings should be made "promptly after the close of the pleadings" or the court may refuse to hear the motion on the ground that its consideration will delay or interfere with the commencement of the trial. *Cain v. Bd. of Comm'rs of Cass Cnty.*, 491 N.E.2d 544, 546 (Ind. Ct. App. 1986). The determination whether the motion amounts to a delay of trial is within the discretion of the trial judge. *Id.* But if it seems clear the motion may effectively dispose of the case, the court should permit it regardless of any possible delay its consideration may cause. *Id.*

[49] Ind. Trial Rule 8 defines the general rules of pleading. It states that "a pleading must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief, and . . . a demand for relief to which the pleader deems entitled. Relief in the alternative or of several different types may be demanded." T.R. 8(A). A plaintiff is not rigidly limited to argue only the theory of recovery she sets out in her complaint. *See, e.g., Buell v. Budget Rent-A-Car of Ind., Inc.*, 151 Ind. App. 21, 24, 277 N.E.2d 798, 800 (1972) (rejecting argument a judgment did not conform to the pleadings because the complaint was solely for declaratory relief but the judgment entered was a money judgment).

[50] Notice pleading merely requires pleading the operative facts in order to place the defendant on notice as to the evidence to be presented at trial. *Noblesville Redevelopment Comm'n v. Noblesville Assocs. Ltd. P'ship*, 674 N.E.2d 558, 563 (Ind. 1996). Therefore, whether a complaint sufficiently pleads a certain claim turns on whether the opposing party has been sufficiently notified concerning the claim so as to be able to prepare to meet it. *Id*. at 563-64. A complaint's allegations are sufficient if they put a reasonable person on notice as to why the plaintiff sues. *Id*. at 564. For the defendant to make efficient and educated legal decisions regarding its case, the complaint must put the defendant on notice concerning why it is potentially liable and what it stands to lose. *Id*.

[51] Kinney had such notice, even though in her original complaint dated April 19, 2007, Demming stated she "prays for judgment against Underwood for damages [and] for an order compelling Underwood and Kinney to convey the

Real Estate to Demming." (Kinney App. at 31.) In November 2011, Kinney, Underwood, and Demming stipulated the proceedings would be bifurcated into a liability trial and a damages trial. Kinney did not assert at that time that the damages trial would be limited to Underwood only or that any judgment against him would be *in rem* only. In May 2012, over a year before Kinney's motion for judgment on the pleadings, the trial court issued its judgment on liability, where it determined Kinney was vicariously liable for Underwood's fraudulent acts. It ordered there would be additional proceedings to "determine an appropriate measure of damages to be awarded in favor of [Demming] *and against the defendants, Cheryl Underwood and Kenneth Kinney*." (Underwood App. at 42) (emphasis added).

[52] In June 2012, Kinney sought discovery from Demming and in her response to Kinney's interrogatories Demming said her claim for damages included "net profits retained by the Defendants during the time they owned and managed [the Properties]." (Appellee's App. at 28.) Demming said in her response she expected to call Kinney as a witness at the damages trial. Demming submitted documents in response to Kinney's request for "[t]rue, complete, and authentic copies of any and all documents *in support of Your request for damages*,"[7] (*Id.* at 33) (emphasis added), and for "[a]ny and all exhibits to be used at any future damages trial in this cause." (*Id.* at 34.) Kinney had adequate notice Demming

---

[7] That language is from Demming's response to Kinney's request. Each party submitted an Appendix, but none appears to include Kinney's request for production of documents.

was claiming damages from him and he had an opportunity to prepare a defense to such claim.

### Kinney's Vicarious Liability

[53] The trial court determined Kinney was vicariously liable for Underwood's actions. The doctrine of vicarious liability as it applies to general partnerships is an effect of the rule that each partner is the agent of the others. *Demming*, 943 N.E.2d at 895. Under the doctrine, a partnership is liable for the actions of any one of its members in conducting the partnership business. *Id*; *and see* Ind. Code § 23-4-1-13 (partnership is liable for wrongful acts or omissions of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners); Ind. Code § 23-4-1-15 (partners are jointly and severally liable for everything chargeable to the partnership under Indiana Code section 23-4-1-13).

[54] A partnership is an association of two or more persons to carry on as co-owners of a business for profit. *Life v. F.C. Tucker Co.*, 948 N.E.2d 346, 351 (Ind. Ct. App. 2011). A "person" may be an individual, partnership, limited liability company, corporation, or other association. *Id*. at 351-52. The two requirements of a partnership are: (1) a voluntary contract of association for the purpose of sharing profits and losses which may arise from the use of capital, labor, or skill in a common enterprise; and (2) an intention on the part of the parties to form a partnership. *Id*. at 352.

[55] Kinney argues he should not be vicariously liable for Underwood's acts because they had not yet become partners in a business to own and lease the Sixth Street properties. We rejected that argument in *Demming*:

> [T]he Defendants argue that although Kinney and Underwood are now partners in a business to own and lease the Properties, Kinney is not vicariously liable for Underwood's alleged breach of fiduciary duty and constructive fraud because the partnership had not yet been formed at the time that Underwood first made an offer to purchase the Properties. However, Underwood testified in her deposition that the partnership existed at the time she tendered the first offer to purchase on March 9, 2007.
>
> * * * * *
>
> The Defendants' argument that the partnership had not yet been formed when Underwood first made an offer to purchase the Properties is simply an invitation for this court to consider the evidence and inferences least favorable to Demming, which we will not do.

943 N.E.2d at 895-96.

[56] In the case before us, there was evidence to support the trial court's determination Kinney and Underwood were partners when the Properties were purchased and Kinney was therefore vicariously liable for Underwood's actions. Underwood and Kinney had owned and managed rental properties together before they bought the Sixth Street properties. On March 9, 2007, Underwood told Kinney she was going to buy the Properties and "she needed a partner and wondered if I was interested." (Appellee's App. at 40.) That same day, Kinney went to a bank and completed a personal financial statement to determine "whether we could raise the funds or what, what we could do." (*Id.* at 44.)

The existence of a partnership is generally a question of fact. *Curves for Women Angola v. Flying Cat, LLC*, 983 N.E.2d 629, 632 (Ind. Ct. App. 2013). Because the present action was tried before the judge without a jury, the trial court was the finder of fact. We will disturb the findings of fact only when they are clearly erroneous – that is, if the record reveals no facts or inferences on which the trial court could have based its findings. *Id*. Underwood and Kinney had been partners in real estate purchases in the past. Underwood told Kinney she needed a partner to purchase the Properties and she asked if Kinney was interested. Kinney took steps that day to obtain financing. When Demming learned Underwood had bought the Properties, she asked Underwood "who did you take on as a partner," (Tr. at 126), and Underwood said "I chose [Kinney] and, and I knew [Kinney] had money, so I knew that that was probably well funded." (*Id*. at 127.) That evidence permitted the trial court to infer Kinney was Underwood's partner when she purchased the Properties. We cannot find clear error.

## Conclusion

The trial court's determinations Underwood was Demming's agent, that Kinney and Underwood were partners in the purchase of the Properties, and Underwood breached her duty to Demming were not clearly erroneous. The trial court did not abuse its discretion in calculating damages, awarding attorney fees, or denying Kinney's motion for judgment on the pleadings. However, it should not have awarded prejudgment interest. We accordingly

affirm in part, reverse in part, and remand for recalculation of the damage award to reflect the removal of prejudgment interest.

[59] Affirmed in part, reversed in part, and remanded.

Robb, J., and Mathias, J., concur.